AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.                                                    AFFIDAVIT

PHILIP H. BLOOM

CASE NUMBER:

UNDER SEAL

I, Complainant Special Agent In Charge Patrick McKenna, Jr. being duly sworn, state the following is true and correct to the best of my knowledge and belief.

    1.  Your Complainant, Patrick McKenna, Jr. is a Special Agent In Charge with the Special Inspector General for Iraq Reconstruction (SIGIR).  Your Complainant's responsibilities include the investigation of possible criminal violations of the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code) and related offenses.

    2.  I have been a Special Agent In Charge with SIGIR for over eighteen months.  Prior to that, I was a Special Agent with the U.S. Government in various agencies for over 30 years. I have personally conducted or assisted in investigations of alleged criminal violations of U.S. law, including the Money Laundering Control Act of 1986, codified at 18 U.S.C. §§ 1956 and 1957.  I am familiar with the facts and circumstances set forth below from my participation in the investigation of BLOOM and others, as well as through conversations with other law enforcement agents, in particular agents of the Internal Revenue Service – Criminal

1

Investigation Division (IRS-CID) and Immigration and Customs Enforcement (ICE), and through reviewing evidence obtained during the course of the investigation. This Complaint is being submitted for the limited purpose of establishing probable cause to believe that BLOOM has knowingly conspired to violate the criminal laws of the United States, namely, conspiring to violate 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 2314 (interstate transportation of stolen property) in violation of 18 U.S.C. § 371 (conspiracy); and for conspiring to violate 18 U.S.C. § 1956 and § 1957, in violation of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering). Therefore, I have not included the details of every aspect of this investigation but only those facts to support probable cause. Where conversations or statements are related herein, they are related in substance and in part only unless otherwise indicated.

     3. This Application for a Criminal Complaint arises from a criminal investigation of BLOOM and others following an audit in late 2004. BLOOM is a United States citizen, who, during all relevant times, operated and controlled several construction and service companies in Iraq and Romania which were awarded contracts from the Coalition Provisional Authority – South Central Region (CPA-SC) in Al-Hillah, Iraq. Those corporations include GLOBAL BUSINESS GROUP, GBG HOLDINGS, and GBG-LOGISTICS DIVISION, (hereinafter referred to collectively as "GBG"). BLOOM conspired with United States Government contract employees and military officials to obtain fraudulently government contracts which were awarded for the reconstruction and stabilization of Iraq. The investigation has revealed that contracts were awarded to businesses controlled by BLOOM through a rigged bidding process, that the work was ordered by certain of BLOOM's co-conspirators, and that such contracts were authorized for payment by BLOOM co-conspirators (in some cases without any performance of the

contracts by BLOOM'S companies).  The investigation further revealed that BLOOM, through his businesses and personal bank accounts, paid kickbacks and bribes, and provided gratuities, to government officials, including to his co-conspirators.

    4.  Co-conspirator One was a public official who held the position as Comptroller and Funding Officer for CPA South Central Region in Iraq.  In this capacity, Co-conspirator One controlled the expenditure of approximately $82 million dollars in currency which was to be used for payment of contract services rendered in Al-Hillah, Iraq, including contracts awarded to BLOOM and his businesses.  Co-conspirator Two was a public official who worked with Co-conspirator One and was involved in ordering the work that would be the subject of contract solicitations in the CPA-SC Region.  Co-conspirator Two has been cooperating with your Complainant and other law enforcement officers involved in the investigation of this matter.  Co-conspirator Two has admitted to investigators that he unlawfully received cash and goods from BLOOM in return for using his official position to help obtain CPA-SC Region contracts for BLOOM companies.  Witness A is an Iraqi business owner who conducted business in Al-Hillah, Iraq, and was personally familiar with the contracting processes conducted by BLOOM, and other public officials in the CPA-SC Region.

    5.  The investigation has revealed that there were no legitimate competing bids for any of the contracts awarded to GBG.  Rather, according to Witness A and Co-conspirator Two, all of the bids awarded to BLOOM were rigged by Co-conspirator One and others through the submission of fake or excessively "high" bids designed to enable other co-conspirators to award the winning "low" bid to BLOOM's companies or companies under his control.

6. The investigation has further revealed that BLOOM and others would engage in unlawful acts to obtain contracts fraudulently and receive payments, or cause payments to be made, on such contracts awarded to BLOOM'S companies. The contracts were purported to be for the rebuilding and stabilization of Iraq, including but not limited to the renovation of the Karbala Public Library, demolition work related to, and the construction of, the Al Hillah Police Academy, the upgrading of security at the Al Hillah Police Academy, and the construction of the Regional Tribal Democracy Center. With the assistance of Co-conspirator One and others, BLOOM submitted, or caused to be submitted, numerous bids on the same contract. The "high bids" were submitted in the names of different companies all controlled by BLOOM or the companies simply did not exist. BLOOM would also submit, or cause to be submitted, a "low" bid in the name of GBG. Co-conspirator One and others, including public officials purportedly acting in their official capacities, would then ensure that the contract was awarded to GBG or a company under BLOOM's control. The value of these contracts ranged up to $498,900. Co-conspirator One's approval authority for awarding contracts was limited to contracts less than $500,000.

7. The investigation has further revealed that Co-conspirator One and others, without proper authority, would request and authorize payment to BLOOM's companies, including payments in advance of performance and despite defective performance of the contracts by BLOOM's companies. BLOOM, acting directly or through businesses he controlled, and in return for official action by Co-conspirator One, Co-conspirator Two, and others, would pay bribes and kickbacks or provide gratuities to Co-conspirator One, Co-conspirator Two, and others, including but not limited to the transfer of funds from foreign bank accounts in Iraq, Switzerland, Romania and Amsterdam to bank accounts in the United States, including

accounts maintained in the United States held in the names of Co-conspirator One and/or Co-conspirator One's spouse, Co-conspirator Two and/or Co-conspirator Two's spouse, or others.

8. Between January and June 2004 through the purportedly official efforts of the co-conspirators, BLOOM received at least $3,500,000 in payment for numerous contracts awarded by the CPA- SC Region of Iraq to companies owned by BLOOM or under his control. The investigation has revealed that Co-conspirator One structured the contracts he and other co-conspirators awarded to BLOOM in amounts structured to be under $500,000 in order to avoid scrutiny by CPA Baghdad and other official auditors by keeping the value of all of the contracts beneath Co-conspirator One's contract authority and thereby avoiding higher level scrutiny of the fraudulently awarded contracts.  The investigation has further revealed that Co-conspirator One would authorize specific payments to BLOOM on CPA Form 44, a form which was designed and intended for small purchases not more than $15,000.  The payments authorized by Co-conspirator One grossly exceeded this $15,000 purchase limit. On or about May 30, 2004, Co-conspirator One's approval authority was revoked for failure to account for the funds entrusted to him.

9. The investigation has further revealed that the bid rigging and bribery scheme included, but was not limited to, the following contracts:

   a. On or about January 7, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8023 ("8023"), to GBG in the amount of $497,500.  The purpose of contract 8023 was to provide for construction of the Regional Tribal Democracy Center. Business records show that on or about January 7, 2004, Co-conspirator One authorized a $200,000 cash payment to BLOOM on CPA Form 44, a form which was designed and intended for small purchases less than $15,000.  Business records also

show that on or about January 12, 2004, Co-conspirator One authorized a second payment to BLOOM on CPA Form 44 in the amount of $100,000.  Further, on or about March 12, 2004, Co-conspirator One authorized a third payment to BLOOM on CPA Form 44 in the amount of $97,500.  By using CPA Form 44, the CPA was unaware that Co-conspirator One was entering into contracts for these large amounts.  By avoiding CPA oversight, Co-conspirator One's approval of payments of funds to BLOOM was not revealed to the CPA and its auditing arm.  It is believed that Co-conspirator One was attempting to avoid detection that almost certainly would have occurred as a result of routine audits had he used the proper procedures and forms for purchases of this nature and amount.  A review of the submitted bids for contract 8023 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by BLOOM or did not exist.  This was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.

     b.  On or about January 20, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8063 ("8063"), to GBG in the amount of $95,000.  The purpose of contract 8063 was to provide a 500kv generator for the new Babil Government building.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8063 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by BLOOM or did not exist.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses

controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  Business records show that on or about January 13, 2004, Co-conspirator One authorized a $55,000 cash payment to BLOOM on CPA Form 44, which prohibited its use for expenditures beyond $15,000.  As noted, the payment for this work was made on January 13, 2004 -- days before the contract was even signed on January 20th.  Business records also show that on or about January 20, 2004, Co-conspirator One authorized a $40,000 cash payment to BLOOM, also on CPA Form 44.

  c. On or about January 31, 2004, the CPA-SC Region awarded contract number DABV01-04-R-8090 ("8090") to GBG in the amount of $105,000.  The purpose of contract 8090 was to provide a 500kv generator for the Regional Tribal Democracy Center building.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8090 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either owned or controlled by BLOOM.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  Moreover, business records show that the first payment was authorized before the contract was even approved.  Further, those records reveal that on or about January 13, 2004, Co-conspirator One authorized a $55,000 cash payment to BLOOM on CPA Form 44, well above the $15,000 limit.  Business records also show that on or about February 1, 2004, Co-conspirator One authorized a second

such payment to BLOOM in the amount of $50,000, also on CPA Form 44.

     d. On or about February 20, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8167 ("8167") to GBG in the amount of $452,800.  The contract called for the demolition of the Ba'ath Party Headquarters and the final grading of the future Al Hillah Police Academy.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8167 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by BLOOM or did not exist.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  The certificate of completion for this work was dated February 19, 2004, the day before the contract was signed on February 20th.  Business records show that on or about February 21, 2004, BLOOM received a cash payment of $452,800 under this contract, authorized by Co-conspirator One on CPA Form 44.

     e. On or about March 15, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8265 ("8265") to GBG in the amount of $448,500.  The contract called for upgrades to the security facility for the Al Hillah Police Academy.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8265 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by BLOOM or did not exist.  This analysis was

confirmed by Co-conspirator Two.  Further, other than the businesses controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  Business records show that on or about March 15 and April 5, 2004, respectively, Co-conspirator One authorized payments of $200,000 and $248,500 in currency under the contract to BLOOM, again on CPA Form 44.

 f. On or about March 30, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8339 ("8339") to GBG in the amount of $373,400.  The contract called for the renovation of the existing library in Karbala, Iraq.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate competing bids for this contract.  A review of the submitted bids for contract 8339 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by BLOOM or did not exist.  This analysis was confirmed by Co-conspirator Two.  Further, other than the businesses controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format.  Business records show that on or about March 30, 2004, Co-conspirator One authorized payment on CPA Form 44 to BLOOM in the amount of $373,400.

 g. On or about April 1, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8342 ("8342") to GBG in the amount of $197,500.  The contract called for the landscaping of the existing library in Karbala, Iraq.  Based upon interviews of Witness A and Co-conspirator Two, it was learned that there were no legitimate

competing bids for this contract. A review of the submitted bids for contract 8342 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by BLOOM or did not exist. This analysis was confirmed by Co-conspirator Two. Further, other than the businesses controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format. Business records show that on or about April 1, 2004, Co-conspirator One authorized the payment on CPA Form 44 of $197,500 to BLOOM.

    h. On or about April 1, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8343 ("8343") to GBG in the amount of $224,010. The contract called for the existing library in Karbala, Iraq to be outfitted with furniture. Based upon interviews of Witness A and Co-conspirator Two, it was learned that the bidding process for this contract was false and fraudulent, because BLOOM or other co-conspirators caused to be submitted all of the bids in the names of non-existent entities or a company that BLOOM controlled or influenced, ensuring that the contract would be awarded to BLOOM. On or about April 1, 2004, BLOOM was paid $224,010. Again, the payment was authorized by Co-conspirator One on CPA Form 44.

    i. On or about April 3, 2004, the CPA-SC Region awarded contract number DABV01-04-M-8345 ("8345") to GBG in the amount of $498,900. The contract called for the installation of internet capabilities in the existing library in Karbala, Iraq. Based upon interviews of Witness A and Co-conspirator Two, there were no legitimate competing bids for this contract. A review of the submitted bids for

contract 8345 reveals that they all appear to be fraudulent because the businesses purporting to bid on the contract were either controlled by BLOOM or did not exist. This analysis was confirmed by Co-conspirator Two. Further, other than the businesses controlled by BLOOM, the bids submitted appear to be facially fraudulent in that, among other things, there is no return address or specific point of contact and each bid appeared similar in format. On or about April 3, 2004, business records show that Co-conspirator One authorized the payment of $498,900 on CPA Form 44 to BLOOM.

10. BLOOM directly paid or arranged for the payment of bribes, kickbacks, and gratuities, amounting to at least $200,000 per month, to CPA-SC Region officials, including Co-conspirator One and/or Co-conspirator One's spouse, Co-conspirator Two and/or Co-conspirator Two's spouse, and others, in order to obtain contracts, including the contracts described above. Payments from BLOOM to various government officials have been corroborated by Witness A, Co-conspirator Two, and other persons with personal knowledge of the payments and through reviewing various financial records. For example, I am aware that BLOOM, who controlled the entities which received the contracts described herein, and who paid the aforementioned bribes, kickbacks and gratuities, caused the transfer of funds totaling more than $267,000 from foreign bank accounts to bank accounts in the United States in the name of Co-conspirator One and/or his spouse. In addition, your Complainant has personally reviewed or is aware of financial records which, among other things, detail transfers from entities controlled by BLOOM made on behalf, or for the benefit of, Co-conspirator One, including a wire transfer of $140,000 to a realty company in connection with the purchase of real property in North Carolina by, or on behalf of, Co-

conspirator One.

11. BLOOM sent or caused funds to be sent to account number 3366588 at Bragg Mutual Federal Credit Union in the name of Co-conspirator One's spouse on the following dates and in the following approximate amounts from foreign bank accounts controlled by BLOOM:

| Date | Amount (USD) | Originator's bank |
| --- | --- | --- |
| Jan. 15, 2004 | $30,000 | Credit Bank of Iraq via National Bank of Kuwait |
| Jan. 29, 2004 | $70,000 | Credit Bank of Iraq via National Bank of Kuwait |
| May 3, 2004 | $40,000 | Credit Bank of Iraq via National Bank of Kuwait |
| July 6, 2004 | $25,000 | Credit Bank of Iraq via National Bank of Kuwait |

12. BLOOM also sent, or caused to be sent, funds to account number 4282589 at Bragg Mutual Federal Credit Union in the name of Co-conspirator One on the following dates and in the following approximate amounts from foreign bank accounts controlled by BLOOM:

| Date | Amount (USD) | Originator's bank |
| --- | --- | --- |
| Sep. 27, 2004 | $30,000 | Bank of Hofmann AG, Zurich Switzerland |
| Oct. 20, 2004 | $33,000 | Bank of Hofmann AG, Zurich Switzerland via Credit Suisse |
| Dec. 14, 2004 | $15,000 | Garantibank International, N.V., Amsterdam, Netherlands |
| Dec. 30, 2004 | $15,000 | Garantibank International, N.V., Amsterdam, Netherlands |

13. Based upon bank records that I have reviewed, I know that funds were sent to account number 171009004 at Exchange Bank in the name of Co-conspirator Two and Co-conspirator Two's spouse on the following dates and in the following approximate amounts from foreign bank accounts controlled by BLOOM:

| Date | Amount (USD) | Originator's bank |
|---|---|---|
| April 7, 2004 | $10,000 | ABN AMRO (Romania), S.A. |
| May 5, 2004 | $10,000 | Credit Bank of Iraq via National Bank of Kuwait |
| June 2, 2004 | $35,000 | Credit Bank of Iraq via National Bank of Kuwait |
| July 6, 2004 | $40,000 | Credit Bank of Iraq via National Bank of Kuwait |

14. The following payments were made by BLOOM directly or through business he controlled, on behalf of Co-conspirator One, in the approximate amounts below:

| Date | Amount | Recipient |
|---|---|---|
| Mar. 3, 2004 | $14,973 | Jeweler |
| Mar. 15, 2004 | $14,975 | Jeweler |
| Mar. 29, 2004 | $140,000 | Realty firm |
| April 27, 2004 | $1,973 | Auto Dealership |
| April 28, 2004 | $60,017 | Auto Dealership |
| June 3, 2004 | $5,523 | Auto Dealership |
| June 4, 2004 | $44,261 | Auto Dealership |
| Jan. 27, 2005 | $6,400 | Jeweler |

15. Based upon your Complainant's experience, I believe that the financial and monetary transactions described above are part of a conspiracy to violate United States law, including but not limited to 18 U.S.C. § 1343 and § 2314, in violation of 18 U.S.C. § 371, and a money laundering conspiracy to violate Sections 1956 and 1957 of Title 18, United States Code. I believe that BLOOM and others caused or facilitated such financial transactions, which involved the proceeds of specified unlawful activities, namely, the interstate transportation of stolen financial funds (18 U.S.C. § 2314) and wire fraud (18 U.S.C. § 1343) in order to conceal the source and origin of the funds and to promote further unlawful activity. In addition, I believe that BLOOM and others caused or facilitated monetary transactions involving criminally derived property, by through or to financial institutions, in amounts

13

exceeding $10,000.

       Signature of Complainant: _____

**Patrick McKenna, Jr.**
**Special Agent In Charge, SIGIR**

Approved:   Richard Weber, Chief
Mark J. Yost, Trial Attorney
Patrick Murphy, Trial Attorney
Asset Forfeiture and Money Laundering Section

Noel L. Hillman, Chief
James A. Crowell IV, Trial Attorney
Ann C. Brickley, Trial Attorney
Public Integrity Section

Paul Pelletier
Fraud Section, Criminal Division, U.S. Department of Justice

**Sworn to before me and subscribed in my presence on Nov. \_\_\_, 2005, at Washington, D.C.**

Signature: _____       _____, Magistrate Judge