## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. |
| | ) | |
| v. | ) | Count One: 18 U.S.C. § 371 |
| | ) | (Conspiracy) |
| | ) | Count Two: 18 U.S.C. § 201 |
| PHILIP H. BLOOM., | ) | (Bribery) |
| | ) | Count Three: 18 U.S.C. |
| Defendant. | ) | § 1956(h) (Money Laundering |
| | ) | Conspiracy) |

### INFORMATION

The United States charges:

### COUNT ONE
### 18 U.S.C. § 371
### (Conspiracy)

At all relevant times:

1.   From in or about December 2003 until in or about December 2004, Defendant

### Philip H. BLOOM ("BLOOM")

and others did knowingly and unlawfully conspire with others known and unknown to violate statutes of the United States, namely 18 U.S.C. § 201 (bribery), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), and 18 U.S.C. § 2314 (interstate transportation of stolen property), by, among other things, accepting money and other items of value in exchange for steering contracts to a government contractor in Al-Hillah, Iraq through a rigged bidding process and by stealing U.S. currency designated to be used for the reconstruction of Iraq.

## BACKGROUND

2.   On May 8, 2003, the United States and the United Kingdom presented a joint letter to the United Nations stating that they "and Coalition partners, acting under existing command and control arrangements through the Commander of Coalition Forces, have created the Coalition Provisional Authority (CPA), which includes the Office of Reconstruction and Humanitarian Assistance (ORHA), to exercise powers of government temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction."   The President of the United States appointed a United States Ambassador to serve as the Administrator of the CPA and thus the civil governing authority of Iraq but who remained subject to the President.

3.   In 2003, Congress appropriated $698 million in initial funding to the CPA for its daily operating budget as part of the Emergency Wartime Supplemental Appropriations Act.   Thereafter, the CPA conducted its operations and awarded contracts for projects intended to promote Iraq's reconstruction from several funding sources, including over $24.1 billion in funds appropriated in 2003-2004 by Congress from the General Funds of the United States as well as $2.1 billion in repatriated Iraqi funds that were confiscated by the United States during the Gulf War in 1990.   The United States deposited $210 million of the

2

repatriated funds into a CPA account known as the Development
Fund for Iraq (DFI) which in addition to the United States'
deposits, also included Iraqi funds derived from oil sales.

    4.    The CPA was primarily staffed by Department of Defense
(DOD) employees, including civilians and members of the military
forces detailed to the CPA ("DOD employees"), as well as DOD
contractors and subcontractors, who were responsible for the
management, accounting, and expenditure of all of the
aforementioned funds.

    5.    In order to enter into contracts for the rebuilding of
Iraq, the CPA used DOD contracting forms and procedures as well
as creating CPA-specific contracting forms and procedures.  The
CPA promulgated its procedures in the CPA Contracting Memorandum
which referenced and incorporated the competition, transparency
and accountability standards applicable to federally-funded DOD
contracts.  As examples, the CPA utilized CPA Form 44 to
authorize small payments (called "micropurchases") on CPA
contracts for less than $15,000, and it established monetary
limits on the contracts that could be approved by certain
officials.

    6.    CPA contracting rules prohibited the use of
appropriated or DFI funds to purchase weapons.

    7.    Defendant **BLOOM** is a United States citizen who
operated and controlled construction and service companies in

Iraq and Romania, which did business with the CPA-South Central
Region (CPA-SC) in Al Hillah, Iraq.

8.    Robert Stein ("Stein") was a DOD contract employee, who
served in various positions at the CPA-SC including Comptroller
and funding officer and was assigned to the United States Embassy
in Al-Hillah, Iraq.  In his official capacity, Stein and other
co-conspirators controlled the expenditure of over $82 million
dollars in funds, including appropriated and DFI funds that were
to be used for the payment of contract services rendered in Al-
Hillah, Iraq for the rebuilding of Iraq.  Prior to working for
the CPA, in July 1996, Stein had been convicted of access device
fraud, in violation of 18 U.S.C. § 1029, in the U.S. District
Court for the Eastern District of North Carolina.

9.    Co-conspirator One is an officer in the United
States Army Reserve, a DOD component.  During times relevant to
this Information, Co-conspirator One served as the Chief of Staff
for the CPA-SC, and was responsible for supervising the CPA
personnel who award contracts related to the reconstruction of
Iraq and made payments for the CPA-SC in Al Hillah, Iraq,
including Stein.

10.   Co-conspirators Two, Three, Four and Five are officers
in the United States Army Reserve.  During relevant times, each
served under the direct supervision of Co-conspirator One at the
CPA-SC in Al-Hillah, Iraq.  Co-conspirator Two and Three's duties

4

included serving as advisors and project officers on projects for the reconstruction of Iraq which involved recommending the expenditure of CPA funds for those projects.  Co-conspirator Four's duties included serving as the Deputy Comptroller to Stein and, in his absence, she served as the acting Comptroller for the CPA-SC.  Co-conspirator Five was a contract officer responsible for administering contracts entered into between the CPA-SC and private contractors doing business in Iraq.

11.  During relevant times, Persons A, B and C were public officials working for or with the CPA in the United States' reconstruction efforts in Iraq.  Person D owned and operated a financial services business outside the United States.

## THE CONSPIRACY AND ITS OBJECTS

12.  Beginning in or about December 2003 and continuing until in or about December 2004, in Al-Hillah, Iraq and elsewhere, Defendant **BLOOM** did knowingly and willfully combine, conspire, confederate, and agree with Stein and with others known and unknown to the United States to commit the following offenses against the United States:

a.   to directly and indirectly, corruptly give, offer and promise something of value, that is money and goods from Defendant **BLOOM**, to any public official in return for that official being influenced in the performance of official acts and for being induced to do or omit to do acts in violation of a

lawful duty; that is in return for Defendant **BLOOM** providing
Stein and other public officials with money, goods, and other
items of value, Stein, Co-conspirators One, Two, Three, Four,
Five and others violated CPA and DOD procurement regulations and
other laws in order to steer contracts to Defendant **BLOOM** and his
companies and arrange for payment to him on those contracts, in
violation of 18 U.S.C. § 201(b)(1)(A) and (C); and

    b.   to devise a scheme and artifice to defraud and to
obtain money and property by means of materially false and
fraudulent pretenses, representations, and promises, and to
deprive the CPA and the DOD of their intangible right to the
honest, loyal, and faithful services of Stein and others by
interstate wire transmissions, in violation of 18 U.S.C. §§ 1343
and 1346; and

    c.   to transport, transmit, and transfer in interstate and
foreign commerce goods, wares, and money, exceeding more than
$5,000 knowing the same to have been stolen, converted and taken
by fraud, in violation of 18 U.S.C. § 2314.

**MANNER AND MEANS OF THE CONSPIRACY**

It was a part of the conspiracy that Defendant **BLOOM**, Stein
and their coconspirators would among other things, do the
following:

13.   Recommend numerous construction projects in Al-Hillah,
Iraq, that were intended to be, and would be, steered to

6

Defendant **BLOOM** and his companies through a rigged bidding process with one "low bid" from a Defendant BLOOM company and several "dummy" bids.

14. Structure the contracts awarded to Defendant **BLOOM** in amounts under $500,000, which was the dollar limit of Stein's authority, in order to conceal the transactions with Defendant **BLOOM** and avoid scrutiny by the CPA's auditors in Baghdad, Iraq, and others. Further, Stein and others would use their official positions to cause, or authorize, the payment on the fraudulently awarded contracts to Defendant **BLOOM** and his companies. In particular, Stein and others would authorize payments on CPA Form 44, exceeding without authorization its $15,000 payment ceiling.

15. Facilitate and conceal Defendant **BLOOM**'s submission of multiple bids on the same CPA contract in the names of different companies which were either non-existent or controlled by Defendant **BLOOM.** The bids submitted included both the "low" bid and several "high" bids which enabled Stein and others to steer over $8,000,000 in contracts to Defendant **BLOOM** and his companies.

16. Solicit and accept money and other things of value, such as secret employment or potential future employment, business or first class plane tickets, watches and other jewelry, alcohol, cigars, sexual favors from women provided by Defendant **BLOOM** at his villa in Baghdad, and money laundering services,

7

from Defendant **BLOOM** and facilitated by Defendant BLOOM, in exchange for taking action favorable to Defendant **BLOOM**, for refraining from taking action that was unfavorable to Defendant **BLOOM** and his interests, and for unlawfully conveying property to him, including real property and government-owned or acquired personal property such as body armor and other military equipment.

17. Steal U.S. currency including appropriated and DFI funds that were designated to be used for the reconstruction of Iraq. A portion of the stolen currency was smuggled into the United States by Stein and his Co-conspirators via commercial aircraft. Stein and others also delivered some of the stolen currency to Defendant **BLOOM**, who, knowing that the currency was stolen, would deposit it in foreign bank accounts, including accounts under his control in Iraq, Switzerland and Romania. At least a portion of such funds were then transferred to bank accounts controlled by Stein or other Co-conspirators or Defendant **BLOOM** would make and facilitate payments on their behalf to purchase real estate, cars, a motorcycle, a recreational vehicle and jewelry.

## OVERT ACTS

18. In furtherance of the conspiracy and in order to accomplish its objects, the following overt acts, among others, were committed by one or more of the coconspirators in Al-Hillah, Iraq and elsewhere:

8

19.   On or about January 1, 2004, Defendant **BLOOM** sent Stein an e-mail directing him to get Co-conspirator Two "on board."

20.   On or about January 3, 2004, Stein sent an e-mail advising Defendant **BLOOM** that he obtained a contract for him and would give him $200,000 on January 4, 2004.

21.   On or about January 3, 2004, Stein and Co-conspirator Three caused the award of CPA contract number 8016 in the amount of $491,000, involving building demolition at the Police Academy in Al Hillah, Iraq.

22.   On or about January 7, 2004, Stein and others caused the award of CPA contract number 8023 to construct a Regional Tribal Democracy Center in Al-Hillah, Iraq to a company controlled by Defendant **BLOOM**.

23.   On or about January 7, 2004, Stein authorized a $200,000 cash payment to Defendant **BLOOM** on CPA Form 44 for performance on contract number 8023.

24.   On or about January 13, 2004, Stein provided Defendant **BLOOM** with his bank account information and the bank's address by e-mail.

25.   On or about January 17, 2004, Stein sent an e-mail to Defendant **BLOOM** advising him that he had two contracts to award to him, namely, the generator and the next phase of the police academy, and discussing the wiring of funds.

26.   On or about January 22, 2004, Stein sent an e-mail to

Defendant **BLOOM** advising him that Co-conspirator Five was ready to award "everything to [Defendant **BLOOM**] but [Co-conspirator Five] asked [Stein] if there was anyway [they] could use another name other than" Defendant **BLOOM**'s company?

27.  On or about January 22, 2004, Defendant **BLOOM** sent a reply e-mail to Stein advising him that Defendant **BLOOM** would do work on the Police Academy using two different companies that he owned.

28.  On or about January 26, 2004, Defendant **BLOOM** sent an e-mail to Co-conspirator Three inquiring as to which of Defendant **BLOOM**'s companies would be assigned a contract.

29.  On or about January 26, 2004, Stein, signed a DOD Standard Form 1449 contract with a U.S. arms manufacturer based in Sterling, Virginia that provided that the CPA, using appropriated U.S. funds, would purchase the following weapons (the "unauthorized weapons") that were delivered to Fort Bragg, North Carolina, where under the terms of the contract Co-conspirator One would take possession of the weapons:

        a.   four grenade launchers;

        b.   twenty fully automatic submachine guns;

        c.   twelve .308 caliber machine guns;

        d.   twelve .45 caliber pistols; and

        e.   four .45 caliber silencers.

30.  On or about January 27, 2004, Stein sent an e-mail to

Defendant **BLOOM** advising him to be careful what he said around Person B and stating that "[t]he fewer people who know what we are doing the better."

31. On or about January 27, 2004, Stein sent an e-mail to Defendant **BLOOM** thanking him for the "booze," discussing the wire transfer of funds to the United States on Stein's behalf, and discussing payments to Co-conspirator Two.

32. On or about January 29, 2004, Defendant **BLOOM** sent an e-mail to one of his employees directing that employee to obtain business class tickets for Co-conspirator Two and his spouse, and advising the employee that Co-conspirator Two was very important to Defendant **BLOOM**'s company.

33. On or about January 31, 2004, Stein sent an  e-mail to Defendant **BLOOM** advising him that he needed to submit bids for the mobile command post before person A returned, so that Stein could cause the award of the contracts to Defendant **BLOOM**.

34. On or about January 31, 2004, Defendant **BLOOM** responded, stating that he was working on the bids and, within an hour, would bring the bids and "five dummies per bid."

35. On or about February 9, 2004, at the direction of Stein, Defendant **BLOOM** wire transferred $39,578 from his account with Credit Bank of Iraq to the arms manufacturer's account in Illinois.

36. On or about February 18, 2004, Defendant **BLOOM** sent an

e-mail to a one of his company's employees, with a copy to Stein, stating that Stein was working with Defendant **BLOOM** and had the title of Vice President of Operations for Defendant **BLOOM**'s company.

37.  On or about February 19, 2004, Stein sent an e-mail in response to Defendant **BLOOM**'s e-mail of February 18, 2004, stating that he would like his business cards to read "Robert J. Stein, Jr.," and advising Defendant **BLOOM** that Co-conspirator Two was happy because Defendant **BLOOM** agreed to buy a Rolex watch for Co-conspirator Two's spouse.

38.  On or about February 20, 2004, Stein and others caused the award of CPA contract number 8167 for the demolition of the Ba'ath Party Headquarters in Al-Hillah, Iraq to a company controlled by Defendant **BLOOM**.

39.  On or about February 21, 2004, Stein authorized a $452,800 cash payment to Defendant **BLOOM** on CPA Form 44 for performance on contract number 8167.

40. On or about February 25, 2004, Stein sent the an e-mail to Defendant **BLOOM** regarding a payment to Co-conspirator Two.

41.  On or about February 25, 2004, Defendant **BLOOM** sent Stein an e-mail advising him that he sent funds for Co-conspirator Two a week ago.

42.  On or about February 27, 2004, Stein sent an e-mail to Defendant **BLOOM** asking whether he should give Co-conspirator Two

12

$50,000 or $60,000 "to shut him up."

43. On or about February 27, 2004, Stein received an e-mail from Defendant **BLOOM** advising him that he had already paid Co-conspirator Two $110,000.

44. On or about March 15, 2004, Stein and others caused the award of CPA contract number 8265 for upgrades to the security facility for the Al-Hillah Police Academy to a company controlled by Defendant **BLOOM**.

45. On or about March 15, 2004, Stein and others authorized a $200,000 payment to Defendant **BLOOM** on CPA Form 44 for performance on contract number 8265.

46. On or about March 15, 2004, at the direction of Stein, Defendant **BLOOM** wire transferred $201,970 from his account with Credit Bank of Iraq to the arms manufacturer's account in Minnesota.

47. On or about March 15, 2004, Stein and others caused the award of CPA contract number 8339 for the renovation of the public library in Karbala, Iraq to a company controlled by Defendant **BLOOM**.

48. On or about March 30, 2004, Stein authorized a $373,400 payment to Defendant **BLOOM** on CPA Form 44 for performance on CPA contract number 8339.

49. On or about April 1, 2004, Stein and others caused the award of CPA contract number 8345 to provide internet

capabilities for the public library in Karbala, Iraq to a company
controlled by Defendant **BLOOM**.

50.   On or about April 3, 2004, Stein authorized a $498,900
payment to Defendant **BLOOM** on CPA Form 44 for performance on CPA
contract number 8345.

51.   On or about April 5, 2004, Stein authorized a $248,500
payment to Defendant **BLOOM** on CPA Form 44 for performance on
contract Number 8265.

52. On or about May 6, 2004, Co-conspirator Two sent an e-
mail to Defendant **BLOOM** providing him with information about the
SUV that Defendant **BLOOM** would purchase for Co-conspirator Two.

53.   On or about May 9, 2004, Stein sent an e-mail to Co-
conspirator Two reminding him that Defendant **BLOOM** was to receive
certain military equipment "when things wind down."

54.   On or about May 19, 2004, Stein directed Co-conspirator
Four to "stash away" approximately $420,000 in currency.

55.   On or about June 20, 2004, Co-conspirator One sent an
e-mail to Defendant **BLOOM** inquiring about the status of the car
he requested from Defendant **BLOOM**.

56.   On or about June 25, 2004, Defendant **BLOOM** received an
e-mail from Person D regarding the car requested by Co-
conspirator One.

57.   On or about June 25, 2004, Stein sent an e-mail to Co-
conspirator One telling him to be careful what he tells Person C

14

and that Stein was doing his "best to keep a formal investigation from happening."

58.  On or about July 2, 2004, Co-conspirator Four smuggled approximately $300,000 of stolen currency into the United States.

59.  In or about July 2004, Co-conspirator Four sent by Federal Express to a business in California, at the direction of Stein, stolen currency that she had smuggled into the United States from Iraq.

60.  On or about July 7, 2004, Co-conspirators Three and Four obtained illegal and unauthorized weapons through false pretenses and transported them from Ft. Bragg, North Carolina to a hotel in the Fayetteville, North Carolina area.

61.  On or about July 10, 2004, Stein and Co-conspirators Three and Four transported the illegal and unauthorized weapons from a hotel to Stein's garage in Hope Mills, North Carolina, where certain weapons, including several .45 caliber pistols and .45 caliber silencers, and a SA58 .308 caliber machine gun were taken for the personal use of Co-conspirators Three and Four and transported from North Carolina to, respectively, Wisconsin and New Jersey, leaving the remaining weapons in Stein'S garage.

62.  On or about August 24, 2004, at the direction of Stein, Defendant **BLOOM** wire transferred $69,620 to an arms manufacturer's bank account in Virginia.

15

63.  In or about August 2004, Co-conspirator Four sent by Federal Express to Stein a portion of the stolen currency that she had smuggled into the United States from Iraq.

64.  On or about August 24, 2004, Co-conspirator Four sent an e-mail to Defendant **BLOOM**, copy to Stein and Person D, regarding the Cadillac Escalade that Defendant **BLOOM** was purchasing for her.

65.  On or about September 2, 2004, Co-conspirator Four sent an e-mail to Defendant **BLOOM** thanking him for the Cadillac Escalade.

66.  On or about September 3, 2004, Co-conspirator Four sent an e-mail to Stein asking whether she could count on Defendant **BLOOM** for a "payback" and wanting to know how much she would get in the end.

67.  In or about October 2004, Co-conspirator Four sent by Federal Express to Stein a portion of the stolen currency that she had smuggled into the United States from Iraq.

68.  In or about December 2004, Co-conspirator Four sent by Federal Express to Stein a portion of the stolen currency that she had smuggled into the United States from Iraq.

69.  On or about the following dates, Defendant **BLOOM** caused the following wire transfers of funds to be sent to Stein or his spouse or others acting on Stein's behalf, or to their

coconspirators or spouses or persons acting on their behalf, from foreign bank accounts Defendant **BLOOM** controlled:

| Date | Amount | Description |
|------|--------|-------------|
| 1/15/04 | $30,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 1/27/04 | $6,500 | Transfer for benefit of STEIN (for the purchase of jewelry, from a jeweler in North Carolina) |
| 1/29/04 | $70,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 2/9/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/9/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/17/04 | $50,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 3/2/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 3/3/04 | $15,000 | Transfer for benefit of STEIN (for the purchase of jewelry) |
| 3/15/04 | $15,000 | Transfer for benefit of STEIN (for the purchase of jewelry) |
| 3/15/04 | $50,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 3/29/04 | $140,000 | Transfer for benefit of STEIN (for the purchase of real estate in Hope Mills, North Carolina) |
| 3/29/04 | $100,000 | Transfer for benefit of STEIN (for the purchase of real estate in Hope Mills, North Carolina) |
| 4/7/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Romania to a bank in California) |
| 4/26/2004 | $9,475 | Transfer for benefit of STEIN (for the purchase of an automobile) |

| 4/27/04 | $1,973 | Transfer for benefit of STEIN (for the purchase of an automobile) |
|---------|--------|---------------------------------------------------------------------|
| 4/28/04 | $60,017 | Transfer for benefit of STEIN (for the purchase of an automobile) |
| 5/3/04 | $40,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 5/3/04 | $25,000 | Transfer for benefit of STEIN (for the purchase of real estate in Hope Mills, North Carolina) |
| 5/3/04 | $35,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 5/5/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/2/04 | $35,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/3/04 | $5,523 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 6/4/04 | $44,261 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 7/6/04 | $20,000 | Transfer for benefit of STEIN (for the purchase of real estate in Hope Mills, North Carolina) |
| 7/6/04 | $25,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $75,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 7/20/04 | $14,968 | Transfer for benefit of STEIN (for the purchase of a recreational vehicle) |
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |

| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to an automobile dealer in New Jersey). |
| 9/13/04 | $124,962 | Transfer for benefit of STEIN (for the purchase of a recreational vehicle) |
| 9/27/04 | $30,000 | Transfer for benefit of STEIN (from a bank in Switzerland to a bank in North Carolina) |
| 9/30/04 | $8,472 | Transfer for benefit of STEIN (for the purchase of a recreational vehicle) |
| 10/20/04 | $33,000 | Transfer for benefit of STEIN (from a bank in Switzerland to a bank in North Carolina) |

**All in violation of Title 18, United States Code, Section 371.**

**COUNT TWO**
**18 U.S.C. § 201**
**(Bribery)**

70.   Paragraphs 2 through 69 of this Information are incorporated by reference as if fully stated herein, and the following is further alleged:

71.   Beginning in or about December 2003 and continuing until at least in or about December 2004, in Al-Hillah, Iraq and elsewhere, Defendant,

**Philip H. BLOOM**

directly and indirectly, corruptly gave, offered and promised something of value, that is money and goods from Defendant **BLOOM**, to a public official in return for that official being influenced in the performance of official acts and for being induced to do

19

and omit to do acts in violation of a lawful duty; that is in
return for Defendant **BLOOM** providing Stein and other public
officials with money, goods, and other items of value, Stein, Co-
conspirators One, Two, Three, Four, Five and others violated CPA
and DOD procurement regulations and other laws in order to steer
contracts to Defendant **BLOOM** and his companies and arrange for
payment to him on those contracts.

**All in violation of Title 18, United States Code, Section 201.**

**Count THREE**
**18 U.S.C. § 1956(h)**
**(Money Laundering Conspiracy)**

72.   Paragraphs 2 through 71 of this Information are
incorporated by reference as if fully stated herein.

73.   From in or about December 2003 to in or about December
2005, in Iraq and elsewhere, Defendant

**Philip H. BLOOM**

unlawfully and knowingly conspired, combined, confederated and
agreed with Stein, Co-conspirators One, Two, Three, Four, and
Six, and with other individuals known and unknown, to commit
money laundering in violation of Title 18, United States Code,
Sections 1956(h), 1956(a) and 1957.

74.   In connection with such conspiracy, Defendant **BLOOM**,
Stein and others:

        a.   conducted and attempted to conduct financial
transactions, affecting interstate and foreign commerce, which

transactions involved the proceeds of specified unlawful activity, namely wire fraud in violation of Title 18, U.S. Code, Section 1343, bribery in violation of Title 18, U.S. Code, Section 201, and the interstate transportation of stolen property in violation of Title 18, U.S. Code, Section 2314, with the intent to promote the carrying on of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

b.    conducted and attempted to conduct financial transactions, affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, namely wire fraud in violation of Title 18, U.S. Code, Section 1343, bribery in violation of Title 18, U.S. Code, Section 201, and the interstate transportation of stolen property in violation of Title 18, U.S. Code, Section 2314, with the intent to conceal the source, nature, origin, ownership and control of the proceeds of such specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

c. caused or facilitated the transfer of a monetary instrument and funds from or through a place outside the United States to a place inside the United States with the intent to promote the carrying on of a specified unlawful activity, namely wire fraud in violation of Title 18, U.S. Code, Section 1343, bribery in violation of Title 18, U.S. Code, Section 201, and the interstate transportation of stolen property in violation of

21

Title 18, U.S. Code, Section 2314, in violation of 18 U.S.C. §
1956(a)(2)(A);

d.   caused or facilitated the knowing transport and
transfer, and attempt to transport and transfer, monetary
instruments and funds from a place outside the United States to a
place in the United States knowing that the monetary instruments
and funds involved in the transportation represented the proceeds
of some form of unlawful activity and knowing that such
transportation was designed in whole or in part to conceal and
disguise the nature, location, source, origin, ownership and
control of the proceeds of specified unlawful activity, namely
wire fraud in violation of Title 18, U.S. Code, Section 1343,
bribery in violation of Title 18, U.S. Code, Section 201, and the
interstate transportation of stolen property in violation of
Title 18, U.S. Code, Section 2314, in violation of 18 U.S.C. §
1956(a)(2)(B)(i);

e.   caused or facilitated the knowing transport and
transfer, and attempt to transport and transfer, monetary
instruments and funds from a place outside the United States to a
place in the United States knowing that the monetary instruments
and funds involved in the transportation represented the proceeds
of some form of unlawful activity and knowing that such
transportation was designed in whole or in part to avoid a

22

transaction reporting requirements under state or federal law, in violation of 18 U.S.C. § 1956(a)(2)(B)(ii); and

f. engaged or attempted to engage in monetary transactions, by, through or to a financial institution, in criminally derived property that was of a value greater than $10,000, knowing that such property was derived from unlawful activity and such property was, in fact, derived from specified unlawful activity, namely wire fraud in violation of Title 18, U.S. Code, Section 1343, bribery in violation of Title 18, U.S. Code, Section 201, and the interstate transportation of stolen property in violation of Title 18, U.S. Code, Section 2314, in violation of 18 U.S.C. § 1957.

## THE CONSPIRACY AND ITS OBJECTS

75.  It was an object of the conspiracy for Stein, Defendant **BLOOM**, and Co-conspirators One, Two, Three and Four, as well as with others known and unknown, to engage in money laundering in violation of Title 18, United States Code Sections 1956 and 1957, by:

a. causing or attempting to cause financial transactions, including but not limited to wire transfers and bank deposits, affecting interstate and foreign commerce, involving the proceeds of specified unlawful activity, for the purpose of paying kickbacks and bribes to Stein and others in

connection with the fraudulent award of contracts to Defendant
BLOOM;

b. causing or attempting to cause the transfer of funds
or monetary instruments, representing the proceeds of specified
unlawful activity, from places outside the United States to
places inside the United States including but not limited to wire
transfers and bulk currency smuggling facilitated and concealed
through the use of false documents, nominee corporations and
corporations controlled by or through Defendant BLOOM; and

c. engaging or attempting to engage in monetary
transactions in criminally derived property of a value greater
than $10,000, by through or to financial institutions, stemming
from the conspiracy to obtain money and property from the CPA and
others in Iraq through bribes, kickbacks, payments on fraudulent
contracts, and through the theft of property as well as
appropriated and DFI currency earmarked and designated for the
reconstruction of Iraq.

## MANNER AND MEANS OF THE CONSPIRACY

76. It was a part of the conspiracy that, in order to
promote the ongoing fraud conspiracy alleged in Count 1 and to
conceal the source, nature, origin, ownership and control of the
proceeds of specified unlawful activity, Defendant **BLOOM**, Stein
and others would cause or attempt to cause wire transfers or
other financial transactions to be sent to bank accounts that

24

Stein and others owned or controlled from foreign bank accounts owned or controlled by Defendant **BLOOM**, including but not limited to the following transactions:

| Date | Amount | Description |
|------|--------|-------------|
| 1/15/04 | $30,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 1/27/04 | $6,500 | Transfer for benefit of STEIN (for the purchase of jewelry, from a jeweler in North Carolina) |
| 1/29/04 | $70,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 2/9/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/9/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/17/04 | $50,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 3/2/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 3/3/04 | $15,000 | Transfer for benefit of STEIN (for the purchase of jewelry) |
| 3/15/04 | $15,000 | Transfer for benefit of STEIN (for the purchase of jewelry) |
| 3/15/04 | $50,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 3/29/04 | $140,000 | Transfer for benefit of STEIN (for the purchase of real estate in Hope Mills, North Carolina) |
| 3/29/04 | $100,000 | Transfer for benefit of STEIN (for the purchase of real estate in Hope Mills, North Carolina) |
| 4/7/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Romania to a bank in California) |
| 4/26/2004 | $9,475 | Transfer for benefit of STEIN (for the purchase of an |

| | | automobile) |
|---|---|---|
| 4/27/04 | $1,973 | Transfer for benefit of STEIN (for the purchase of an automobile) |
| 4/28/04 | $60,017 | Transfer for benefit of STEIN (for the purchase of an automobile) |
| 5/3/04 | $40,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 5/3/04 | $25,000 | Transfer for benefit of STEIN (for the purchase of real estate in Hope Mills, North Carolina) |
| 5/3/04 | $35,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 5/5/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/2/04 | $35,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/3/04 | $5,523 | Transfer for benefit of Co-conspirator Two (automobile purchase) |
| 6/4/04 | $44,261 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 7/6/04 | $20,000 | Transfer for benefit of STEIN (real estate purchase) |
| 7/6/04 | $25,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $75,000 | Transfer for benefit of STEIN (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 7/20/04 | $14,968 | Transfer for benefit of STEIN (for the purchase of a recreational vehicle) |
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in |

| Date | Amount | Description |
|---|---|---|
| | | Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to an automobile dealer in New Jersey). |
| 9/13/04 | $124,962 | Transfer for benefit of STEIN (for the purchase of a recreational vehicle) |
| 9/27/04 | $30,000 | Transfer for benefit of STEIN (from a bank in Switzerland to a bank in North Carolina) |
| 9/30/04 | $8,472 | Transfer for benefit of STEIN (for the purchase of a recreational vehicle) |
| 10/20/04 | $33,000 | Transfer for benefit of STEIN (from a bank in Switzerland to a bank in North Carolina) |

77.    It was further a part of the conspiracy that Defendant **BLOOM**, Stein and others would engage or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, by through or to a financial institution, with such property being derived from specified unlawful activity, including but not limited to the following transactions in the approximate amounts and dates listed below:

| Date | Amount | Description |
|---|---|---|
| 1/22/04 | $19,500 | Payment to a law firm for the benefit of Stein. |
| 2/9/04 | $34,791 | Payment to a North Carolina automobile dealer for the benefit of Stein. |
| 2/13/04 | $40,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 3/3/04 | $15,000 | Payment to a North Carolina jewelry company for the benefit of Stein. |
| | | Payment to a North Carolina jewelry company for the benefit |

| 3/15/04 | $15,000 | of Stein. |
|---|---|---|
| 4/21/04 | $19,311 | Payment to a home improvements company for the benefit of Stein. |
| 4/28/04 | $60,017 | Payment to a car dealer for the benefit of Stein. |
| 6/2/04 | $22,024 | Payment to a motorcycle dealer for the benefit of Co-conspirator Two. |
| 8/2/04 | $107,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 8/3/04 | $80,000 | Transfer to investment account for the benefit of Co-conspirator Two. |
| 9/16/04 | $10,527 | Payment to a cabinet company for the benefit of Co-conspirator Four. |
| 10/8/04 | $30,971 | Payment to a North Carolina auto dealer for benefit of Stein. |
| 4/8/05 | $20,000 | Transfer from investment account for the benefit of Co-conspirator Two. |
| 11/11/05 | $11,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |

78. It was further a part of the conspiracy that Stein, Co-conspirator Four and others would structure payments, or cause the structuring of payments, to home improvements companies, car dealerships and others in an attempt to avoid scrutiny by the Internal Revenue Service and others, to evade the reporting requirements of federal law, and in attempt to evade the threshold of 18 U.S.C. § 1957. Transactions which the Co-conspirators caused or attempted to cause for such purposes include, but are not limited to, the following in the approximate amounts and dates listed below:

| Date | Amount | Description |
|------|--------|-------------|
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 10/5/04 | $9,655 | Payment to home improvements company for Stein. |
| 10/7/04 | $9,655 | Payment to home improvements company for the benefit of Stein. |
| 10/11/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 11/12/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 11/24/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 12/15/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE

79.   Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), Defendant

### Philip H. BLOOM

once convicted of Count 1 (conspiracy in violation of 18 U.S.C. § 371) shall forfeit to the United States the following property:

a. Any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

b.  A sum of money equal to the total amount of proceeds traceable to each offense, or to the conspiracy to commit violations of Sections 201, 1343 and 2314, in violation of 18 U.S.C. § 371, as charged in Count 1, for which the defendant is convicted.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

80.  Pursuant to Title 18, United States Code, Section 982, Defendant

### Philip H. BLOOM

once convicted of Count 3 (money laundering conspiracy in violation of 18 U.S.C. § 1956(h)) shall forfeit to the United States the following property:

30

a. All right, title, and interest in any and all property involved in violation of Title 18, United States Code, Section 1956, for which the defendant is convicted, and all property traceable to such property, including the following: 1) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of Sections 1956 and 1957; 2) all commissions, fees and other property constituting proceeds obtained as a result of those violations; and 3) all property used in any manner or part to commit or to facilitate the commission of those violations.

b. A sum of money equal to the total amount of money involved in each offense, or involved in the conspiracy to commit violations of Sections 1956 and 1957, in violation of 18 U.S.C. § 1956(h), as charged in Count 3, for which the defendant is convicted. If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

81. The property to be forfeited in connection with the convictions on Counts 1 and 3 includes but is not limited to the following:

a. Account 19212 at Bank Hofman (Switzerland).

          b.  Military use or protective security detail use

items, including but not limited to body armor,

protective vests, helmets and weapons.

    82.  Pursuant to Title 21, United States Code, Section

853(p), as incorporated by Title 18, United States Code,

Section 982(b) and Title 28 United States Code, Section 2461,

each defendant shall forfeit substitute property, up to the

value of the amount described in the foregoing paragraphs, if,

by any act or omission of a defendant, the property described

in such paragraphs, or any portion thereof, cannot be located

upon the exercise of due diligence; has been transferred, sold

to or deposited with a third party; has been placed beyond the

jurisdiction of the court; has been substantially diminished in

value; or has been commingled with other property which cannot

be divided without difficulty.

**Criminal Forfeiture, in violation of Title 18, United States
Code, Section 982(a); Title 18, United States Code, Section
981(a); and Title 28, United States Code, Section 2461.**

DATED: 1/26/____, 2006, at Washington, DC.

FOR THE UNITED STATES

By: _____

Richard Weber, Chief
Mark J. Yost, Trial Attorney
Patrick Murphy, Trial Attorney
Asset Forfeiture and Money
        Laundering Section

Noel L. Hillman, Chief
James A. Crowell IV, Trial Attorney
Ann C. Brickley, Trial Attorney
Public Integrity Section

Paul E. Pelletier, Chief
Fraud Section

United States Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, DC 20005
Mark.Yost@usdoj.gov
Patrick.Murphy@usdoj.gov
James.Crowell@usdoj.gov
Ann.Brickley@usdoj.gov