

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, )
                                )
     Plaintiff, )
                                )    Criminal No. ~~05-604~~  06-053
                                )
     v. )    Count One: 18 U.S.C. § 371
                                )    (Conspiracy)
                                )    Count Two: 18 U.S.C.
PHILIP BLOOM, )    § 201 (Bribery)
                                )    Count Three: 18 U.S.C.
     Defendant. )    § 1956(h) (Money Laundering
                                )    Conspiracy)

**FILED**

**FEB 2 7 2006**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**FACTUAL BASIS FOR PLEA**

If this case were to go to trial, the United States of
America, by and through the undersigned attorneys of the
United States Department of Justice, Criminal Division, Asset
Forfeiture and Money Laundering Section, Public Integrity
Section, and Fraud Section, and the Defendant, **PHILIP BLOOM,**
personally and through his undersigned counsel, hereby stipulate
that the government could prove the following facts beyond a
reasonable doubt, pursuant to United States Sentencing Guidelines
§ 6A1.1 and Rule 32(C)(1) of the Federal Rules of Criminal
Procedure:

That beginning in or about December, 2003, and continuing
until approximately December, 2004, in Al-Hillah, Iraq and
elsewhere:

1. Defendant **BLOOM** is a United States citizen who
operated and controlled construction and service companies in

1

Iraq and Romania, which did business with the Coalition Provisional Authority-South Central Region (CPA-SC) in Al-Hillah, Iraq.

2.    On May 8, 2003, the United States and the United Kingdom presented a joint letter to the United Nations stating that they "and Coalition partners, acting under existing command and control arrangements through the Commander of Coalition Forces, have created the Coalition Provisional Authority [CPA], which includes the Office of Reconstruction and Humanitarian Assistance [ORHA], to exercise powers of government temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction."    The President of the United States appointed a United States Ambassador to serve as the Administrator of the CPA and thus the civil governing authority of Iraq but who remained subject to the President.

3.    In 2003, Congress appropriated $698 million in initial funding to the CPA for its daily operating budget as part of the Emergency Wartime Supplemental Appropriations Act.    Thereafter, the CPA conducted its operations and awarded contracts for projects intended to promote Iraq's reconstruction from several funding sources, including over $24.1 billion in funds appropriated in 2003-2004 by Congress from the General Funds of the United States as well as $2.1 billion in repatriated Iraqi

2

funds that were confiscated by the United States during the Gulf
War in 1990. The United States deposited $210 million of the
repatriated funds into a CPA account known as the Development
Fund for Iraq (DFI) which in addition to the United States'
deposits, also included Iraqi funds derived from oil sales.

4. The CPA was primarily staffed by Department of Defense
(DOD) employees, including civilians and members of the military
forces detailed to the CPA ("DOD employees"), as well as DOD
contractors and subcontractors, who were responsible for the
management, accounting, and expenditure of all of the
aforementioned funds.

5. In order to enter into contracts for the rebuilding of
Iraq, the CPA used DOD contracting forms and procedures as well
as creating CPA-specific contracting forms and procedures. The
CPA promulgated its procedures in the CPA Contracting Memorandum
which referenced and incorporated the competition, transparency
and accountability standards applicable to federally-funded DOD
contracts. As examples, the CPA utilized CPA Form 44 to
authorize small payments (called "micropurchases") on CPA
contracts for less than $15,000, and it established monetary
limits on the contracts that could be approved by certain
officials.

6. CPA contracting rules prohibited the use of
appropriated or DFI funds to purchase weapons.

3

7.    Robert J. Stein, Jr. ("Stein") was a Department of Defense (DOD) contract employee, who served in various positions at the CPA-SC including Comptroller and funding officer and was assigned to the United States Embassy in Al-Hillah, Iraq. In his official capacity, Stein and other co-conspirators controlled the expenditure of over $82 million dollars in funds, including appropriated and DFI funds that were to be used for the payment of contract services rendered in Al-Hillah, Iraq for the rebuilding of Iraq.

8.    Co-Conspirator One is an officer in the United States Army Reserve, a DOD component. During times relevant to this Information, Co-conspirator One served as the Chief of Staff for the CPA-SC, and was responsible for supervising the CPA personnel who award contracts related to the reconstruction of Iraq and made payments for the CPA-SC in Al Hillah, Iraq, including payments to Defendant **BLOOM** and his companies.

9.    Co-conspirators Two, Three, Four and Five are officers in the United States Army Reserve. During relevant times, each served under the direct supervision of Co-Conspirator One at the CPA-SC in Al-Hillah, Iraq. Co-conspirator Two and Three's duties included serving as advisors and project officers on projects for the reconstruction of Iraq which involved recommending the expenditure of CPA funds for the reconstruction of Iraq. Co-conspirator Four's duties included serving as the Deputy

4

Comptroller to Stein and, in his absence, she served as the acting Comptroller for the CPA-SC. Co-conspirator Five was a contract officer responsible for administering contracts entered into by the CPA and private contractors doing business in Iraq.

10. During relevant times, Persons A, B, C, D, E, I, J and K were public officials working for or with the CPA in the United States' reconstruction efforts in Iraq. Person F owned and operated a financial services business outside the United States. Person G is the spouse of Co-conspirator Two. Person H was an employee of one of Defendant **BLOOM**'s businesses.

### THE SCHEME

11. In return for Defendant **BLOOM** providing Stein and other public officials with money, goods, and other items of value, including the service of laundering currency that Stein and others stole from the CPA, Stein, Co-conspirators One, Two, Three, Four, Five and others violated CPA and DOD procurement regulations and other laws in order to steer contracts to Defendant **BLOOM** and his companies and arrange for payment to him on those contracts.

12. Defendant **BLOOM** worked with Stein and their co-conspirators to ensure that they used their official positions to recommend numerous construction projects in Al-Hillah, Iraq that were intended to be, and were in fact, steered to Defendant **BLOOM** and his companies through a rigged bidding process orchestrated

5

by Defendant **BLOOM** and Stein.

13. Stein used his official position and those of his co-conspirators to structure the contracts awarded to Defendant **BLOOM** in amounts under $500,000, which was the dollar limit of Stein's authority, in order to conceal the transactions with Defendant **BLOOM** and avoid scrutiny by the CPA's auditors in Baghdad, Iraq, and others.

14. Stein used his official position and those of his co-conspirators to cause or authorize the payment of the fraudulently awarded contracts to Defendant **BLOOM** and his companies. In particular, Stein authorized payments on CPA Form 44, exceeding without authorization its $15,000 payment ceiling.

15. Defendant **BLOOM** submitted and caused to be submitted multiple bids on the same CPA contract in the names of different companies which were either non-existent or controlled by Defendant **BLOOM**. The submitted bids included both the "low" bid and several "high" bids which enabled Stein and others to steer over $8,641,375 in contracts to Defendant **BLOOM** and his companies.

16. Defendant **BLOOM**'s average profit margin on all of the contracts fraudulently awarded to him was at least 25 percent.

17. In exchange for Stein and other co-conspirators taking official action favorable to Defendant **BLOOM** or for refraining from taking action that was unfavorable to Defendant **BLOOM** and

6

his interests, Defendant **BLOOM** provided Stein and other public officials money and other things of value, such as secret employment or potential future employment, business or first class plane tickets, watches and other jewelry, alcohol, cigars, sexual favors from women provided by Defendant **BLOOM** at his villa in Baghdad, and money laundering services by Defendant **BLOOM** and his various accounts in Iraq, Romania, Switzerland, and the United States.

18. Defendant **BLOOM** accepted stolen CPA and United States property located in Iraq from Stein including real property and government-owned or acquired personal property such as body armor and other military equipment, which he, Stein and others used for the purposes of operating another business run by Defendant **BLOOM**.

19. Stein used his official position and those of his co-conspirators to steal at least $2,000,000 in United States currency including appropriated and DFI funds that were designated to be used for the reconstruction of Iraq. Stein and others delivered some of the stolen currency to Defendant **BLOOM**, who, knowing that the currency was stolen, deposited it in foreign bank accounts, including accounts under his control in Iraq, Switzerland and Romania. Defendant **BLOOM** then transferred some of these funds to bank accounts controlled by Stein or their co-conspirators, or Defendant **BLOOM** made or facilitated payments

7

on their behalf to purchase real estate, cars, a motorcycle, a recreational vehicle and jewelry.

20. In addition to the laundered stolen currency payments Defendant **BLOOM** made to Stein, their co-conspirators and others, Defendant **BLOOM** provided Stein personally with bribe payments in the form of money and goods.

21. Defendant **BLOOM** laundered the stolen appropriated and DFI funds, as well as the direct bribe payments he paid to his co-conspirators, including Stein, and Co-conspirators One, Two, Three, Four, and others in order to disguise the nature, source, origin and control of the money and to promote and facilitate his payment of the kickbacks and bribes to Stein and others in connection with the fraudulent award of contracts to his companies.

22. Defendant **BLOOM**, Stein, and their co-conspirators caused the transfer of funds and monetary instruments, representing the proceeds of specified unlawful activity in Iraq and elsewhere, from places outside the United States to places inside the United States including but not limited to wire transfers and bulk currency smuggling facilitated through the use of false documents, nominee corporations and corporations controlled by or through Defendant **BLOOM**.

23. Defendant **BLOOM**, Stein, and their co-conspirators engaged in monetary transactions in criminally derived property

8

of a value greater than $10,000, by through or to financial institutions, stemming from the conspiracy to obtain money and property from the CPA and others in Iraq through bribes, kickbacks, payments on fraudulent contracts, and through the theft of property including appropriated and DFI currency earmarked and designated for the reconstruction of Iraq.

24.   In order to facilitate the unauthorized purchase of firearms with CPA funds, Stein stole currency from CPA appropriated and DFI funds, which Defendant **BLOOM** then deposited into his accounts and wire transferred said funds from various accounts in Iraq, Romania and elsewhere to numerous firearms manufacturers in the United States in payment for the unauthorized purchases of firearms made by Stein.

25.   In order to accomplish the crimes charged in the Information, Defendant **BLOOM** and his co-conspirators did the following:

a.   On or about January 1, 2004, Defendant **BLOOM** sent Stein an e-mail directing him to get Co-conspirator Two "on board."

b.   On or about January 3, 2004, Stein sent the following e-mail:

> **From:** [Stein]
> **To:**   [Defendant **BLOOM**]
> **Sent:** Saturday, January 03, 2004 8:29 PM
> **Subject:** Tomorrow
>
> [Defendant **BLOOM**]

9

> FYI, [Co-conspirator Three] and I got the contract
> through of rhte (sic) ground prep at the police
> academy. I will give you 200K sometime tomorrow
> afternoon!
>
> I love to give you money.
>
> Bob

c.    On or about January 3, 2004, Stein and Co-conspirator
Three caused the award of CPA contract number 8016 in the amount
of $491,000, involving building demolition at the Police Academy
in Al Hillah, Iraq to a company controlled by Defendant **BLOOM**.

d.    On or about January 7, 2004, Stein and others caused the
award of CPA contract number 8023 to construct a Regional Tribal
Democracy Center in Al-Hillah, Iraq to a company controlled by
Defendant **BLOOM**.

e.    On or about January 7, 2004, Stein authorized a
$200,000 cash payment to Defendant **BLOOM** on CPA Form 44 for
performance on contract number 8023.

f.    On or about January 13, 2004, Stein provided Defendant
**BLOOM** with his bank account information and the bank's address by
e-mail.

g.    On or about January 17, 2004, Stein sent the following
e-mail, which reads in relevant part:

> **From:** [Stein]
> **To:** [Defendant **BLOOM**]
> **Sent:** Saturday, January 17, 2004 8:51 PM
> **Subject:** Re: Update
>
> [Defendant **BLOOM**]

10

Yes, I would like to see you and get caught up to date. The meeting with [person B] went fine and he knows what I want and what he need (sic) to do! I have two contracts to award to you when I see you, the generator and the next phase of the police academy. I also have the money that you wired for [person C]. I told him 10,000 and to the one account.

\* \* \*

I see a very properious (sic) future!

Bob

h. On or about January 22, 2004, Stein sent the following e-mail:

**From:** [Stein]
**To:** [Defendant **BLOOM**]
**Sent:** Thursday, January 22, 2004 7:44 PM
**Subject:** Police Academy

[Defendant **BLOOM**]

I was talking to [Co-conspirator Five] in contracting about your next set of projects. He is ready to award everything to you but he asked me if there was anyway we could use another name other than [Defendant **BLOOM**'s company]? [Co-conspirator Five] wants to make sure it doesn't look like on the reports that go to Baghdad that all the work is going to [Defendant **BLOOM**'s company]. If you can, put your bid on new letterhead I. I can award it tomorrow. Sorry to be so business like but as you know I am doing everything here with the apporoval (sic) process. I would love to slow down just for a few days and relax but I know I can't. I need to take care of all of this stuff.

Bob

i. On or about January 22, 2004, Defendant **BLOOM** sent the

11

following reply e-mail:

> **Re: Police Academy**
> **From:** [Defendant **BLOOM**]
> **Date:** Thu, 22 Jan 2004 20:21:23 +0300
> **To:** [Stein]
>
> Bob: I will do that for Phases 7-10 on Eastview
> trading and another company I own. Since we are
> paid in cash it really doesn't matter tax wise..
> See you tomorrow.
>
> [Defendant **BLOOM**]

j.    On or about January 26, 2004, Defendant **BLOOM** sent the following e-mail to Co-Conspirator Three:

> **From:** [Defendant **BLOOM**]
> **Sent:** Monday, January 26, 2004 12:39 PM
> **To:** [Co-conspirator Three]
> **Subject:** Fw: Bid Schedule[Defendant **BLOOM**'s
> company].xls
>
> [Co-conspirator Three]:
>
> Attached is the bid proposal you requested. Work
> can start in one day after the award. Let me know
> if you want this on [Defendant **BLOOM**'s company] or
> one of our other companies?
>
> [Defendant **BLOOM**]

k.    On or about January 26, 2004, Stein, signed a DOD Standard Form 1449 contract with a U.S. arms manufacturer based in Sterling, Virginia that provided that the CPA, using appropriated U.S. funds, would purchase the following weapons (the "unauthorized weapons") that were delivered to Fort Bragg, North Carolina, where under the terms of the contract Co-

12

conspirator One would take possession of the weapons:

      a.   four grenade launchers;

      b.   twenty fully automatic submachine guns;

      c.   twelve .308 caliber machine guns;

      d.   twelve .45 caliber pistols; and

      e.   four .45 caliber silencers.

1.  On or about January 27, 2004, Stein sent the following e-mail:

> **From:** [Stein]
> **To:** [Defendant **BLOOM**]
> **Sent:** Tuesday, January 27, 2004 1:02 AM
> **Subject:** Thoughts
>
> [Defendant **BLOOM**]
>
> Courious (sic) about what [person D] had to say. I will warn you to be very careful what you say around him. If he ever knows what we are doing he will want "his cut"! Remember what I told you, he is a player trying to get whatever he can. If he ever knows something about a person he will use it to his advantage.
>
> We have come only a short way and we have much further to go. The fewer people who know what we are doing the better. I am your partner as you put it so trust in me and what I feel.
>
> Bob

m.  On or about January 27, 2004, Stein sent the following e-mail:

> **From:** [Stein]
> **To:** [Defendant **BLOOM**]
> **Sent:** Tuesday, January 27, 2004 8:14 PM
> **Subject:** Re: Update
>
> [Defendant **BLOOM**]

13

Thanks for the booze. That will give me some bargaining material here and there. The ex hasn't sent me an email yet if she received the funds. I am not worried. They will get there.

[Co-conspirator Two] asked me if I heard you say that he was getting 100k for a bonus and his salary would be starting now. Also about the corporate card ect ect ect (sic). He hurts my head sometimes but we will work with him. I will get over the USAID (sic) and see [person J] in the next week and talk electriciry (sic) with her. I may need some information from you.

Thanks again for everything....

Bob

PS: Don't (sic) give [Co-conspirator Two] the Booze, he will drink it!

n. On or about January 29, 2004, Defendant **BLOOM** sent an e-mail with the following information to a GBG employee:

I need business class tickets for [Co-conspirator Two] and His wife [person G]... can you check the routings and get back to me... [Defendant **BLOOM**'s company] will pay for this.... He is the head of the PA....very important to us... I want to make sure its (sic) done right. Can you get someone other than [person H] to handle this. Thanks.

o. On or about January 31, 2004, Stein sent the following e-mail:

**From:** [Stein]
**To:** [Defendant **BLOOM**]
**Sent:** Saturday, January 31, 2004 8:43 AM
**Subject:** Re: meeting

[Defendant **BLOOM**]

Co-conspirator Three] need (sic) the bids for the work at the police academy. [Co-conspirator Two] needs the

14

bids for the mobil (sic) command post for Police and Arch. If I (sic) don't get these today I may not be able to award them before [person A] gets back.

p. On or about January 31, 2004, Defendant BLOOM responded with the following reply e-mail:

> **Subject: Re: meeting**
> **From:** [Defendant **BLOOM**]
> **Date:** Sat, 31 Jan 2004 08:47:12 +0300
> **To:** [Stein]
>
> I am working on them now... they will be ready in one hour... I will send you our bids and bring with me the dummies... I have five dummies per bid...ok..

q. On or about February 9, 2004, at the direction of Stein, Defendant **BLOOM** wire transferred $39,578 from his account with Credit Bank of Iraq to the arms manufacturer's account in Illinois.

r. On or about February 18, 2004, Defendant **BLOOM** sent an e-mail to a one of his company's employees, with a copy to Stein, stating in relevant part:

> Bob STEIN is working with [Defendant **BLOOM**'s company] on many projects and has the title of **VICE PRESIDENT OF OPERATIONS.** I would like you to coordinate with him and to expedite whatever he requires on behalf of [Defendant BLOOM's company]. He will have reports to be redone from time to time, calls to be made, research, etc. Please move quickly when asked.
>
> (Emphasis in original).

s. On or about February 19, 2004, Stein sent the following e-mail in response to Defendant **BLOOM**'s e-mail of February 18, 2004:

15

**From:** [Stein]
**To:** [Defendant **BLOOM**]
**Sent:** Thursday, February 19, 2004 8:05 AM
**Subject:** Re: Fw: Bob STEIN

[Defendant **BLOOM**],

Thanks for this. I wanted to insure on my business card
my name will be Robert J. STEIN. It sounds a bit better
than "Bob". The watches arrived last night and [Co-
Conspirator Two] is happy for now. He told me you are
going to get a rolex for his wife. Thats fine (sic).

[Co-conspirator One] saw them and like (sic) them (sic).
I probably give (sic) him my watch and just get another
one for me. I want to keep him happy and on our side.
There is a very good chance when CPA goes away he will
go to work with the PMO. I think it is well worth the
cost. What do you think?

Bob

t.   On or about February 20, 2004, Stein and others caused

the award of CPA contract number 8167 for the demolition of the

Ba'ath Party Headquarters in Al-Hillah, Iraq to a company

controlled by Defendant **BLOOM**.

u.   On or about February 21, 2004, Stein

authorized a $452,800 cash payment to Defendant **BLOOM** on CPA Form

44 for performance on contract number 8167.

v.   On or about February 25, 2004, Stein sent the following

e-mail to Defendant **BLOOM** regarding a payment to Co-conspirator

Two:

**From:** [Stein]
**To:** [Defendant **BLOOM**]
**Sent:** Wednesday, February 25, 2004 9:00 AM
**Subject:** HOT

16

Phil,

FYI, [Co-conspirator Two] just left my office and he is pissed! I guess he was expecting the next chunk for 60 sent and he got a call from his wife stating he had not received it.

Bob

w.   On or about February 25, 2004, Defendant **BLOOM** sent the following reply e-mail:

> **Subject: Re: HOT**
> **From:** [Defendant **BLOOM**]
> **Date:** Wed, 25 Feb 2004 09:13:04 +0300
> **To:** [Stein]
>
> This is bullshit... I sent the funds a week ago... I will double check....Tell him to stop acting like a child....

x.   On or about February 27, 2004, Stein sent the following e-mail:

> **From:** [Stein]
> **To:** [Defendant **BLOOM**]
> **Sent:** Friday, February 27, 2004 7:18 PM
> **Subject:** Re: 27 FEB
>
> [Defendant **BLOOM**]
>
> Should I go ahead and give [Coconspirator Two] the 50 or 60 to shut him up?
>
> Bob

y.   On or about February 27, 2004, Stein received the following e-mail from Defendant **BLOOM**:

> **Subject: Re: 27 FEB**
> **From:** [Defendant **BLOOM**]
> **Date:** Fri, 27 Feb 2004 19:24:37 +0300

17

**To:** [Stein]

No... I sent the funds already.... this would make 170 not 110.... The funds went out..... what more does he want? This is your call...

z. On or about March 15, 2004, Stein and others caused the award of CPA contract number 8265 for upgrades to the security facility for the Al-Hillah Police Academy to a company controlled by Defendant **BLOOM.**

aa. On or about March 15, 2004, Stein authorized a $200,000 payment to Defendant **BLOOM** on CPA Form 44 for performance on contract number 8265.

bb. On or about March 15, 2004, at the direction of Stein, Defendant **BLOOM** wire transferred $201,970 from his account with Credit Bank of Iraq to AN arms manufacturer's account in Minnesota.

cc. On or about March 15, 2004, Stein and others caused the award of CPA contract number 8339 for the renovation of the public library in Karbala, Iraq to a company controlled by Defendant **BLOOM.**

dd. On or about March 30, 2004, Stein authorized a $373,400 payment to Defendant **BLOOM** on CPA Form 44 for performance on CPA contract number 8339.

ee. On or about April 1, 2004, Stein and others caused the award of CPA contract number 8345 to provide internet capabilities for the public library in Karbala, Iraq to a company controlled by Defendant **BLOOM.**

18

ff.   On or about April 3, 2004, Stein authorized a $498,900 payment to Defendant **BLOOM** on CPA Form 44 for performance on CPA contract number 8345.

gg.   On or about April 5, 2004, Stein and others authorized a $248,500 payment to Defendant **BLOOM** on CPA Form 44 for performance on contract Number 8265.

hh. On or about May 6, 2004, Co-conspirator Two sent the following e-mail:

> **From:** [Coconspirator Two]
> **To:** [Defendant **BLOOM**]
> **Sent:** Thursday, May 06, 2004 11:13 PM
> **Subject:** car info
>
> Hi [Defendant **BLOOM**],
> Here is the info you requested on the SUV I'd like.
> Model: 2004 GMC Yukon Denali All Wheel Drive
> Exterior: Summit White
> Interior: Sandstone Leather
> This vehicle is loaded and I don't think any options are available. It has to meet California emissions; shouldn't be an issue if its actually sold in California.
> The closest major city I live near is Santa Rosa, California.
> What additional information do you need?
> Thanks Phil.
>
> Let me know how I can help you with the local stuff.
>
> v/r [Co-conspirator Two]

ii.   On or about June 20, 2004, Co-conspirator One sent an e-mail to Defendant **BLOOM** inquiring about the status of the car

19

he requested from Defendant **BLOOM.**

jj. On or about June 25, 2004, Defendant **BLOOM** received the following e-mail regarding the car requested by Co-conspirator One:

> **From:** [Person F]
> **To:** [Defendant **BLOOM**]
> **Sent:** Friday, June 25, 2004 9:35 AM
> **Subject:** Blue Nissan 350Z
> PHIL:
>
> Your friend is seeking a very desirable, hard-to-find color: electric blue. It appears that there are only 2 blue Nissan 350Z hardtops in the western United States. [Co-conspirator One] wants the following specifications: Touring model, manual transmission, Aerodynamics Package, Cargo Convenience Package, Floor Mats, Splash Guards, and Trunk Mat.
>
> There is a car in California that has all these features, plus a satellite radio. Cost (including shipping to Salt Lake City): $35,990.
>
> In Salt Lake City there is a similar car that is a Convenience model (not a Touring model), meaning that it has a Nissan radio (not a Boise radio), cloth seats rather than leather, and no heated seats. Everything else is the same, per [Co-conspirator One's] request. Cost: $31,595.
>
> Which of these would [Co-conspirator One] prefer? (From a "value" point of view, the better deal is probably the second.)
>
> [Person F]
>
> P.S.: You say you want pictures. [Co-conspirator One] knows all about the car. To see what the car looks like, the Nissan website is http://www.nissanusa.com/

kk. On or about August 24, 2004, at the direction of

20

Stein, Defendant **BLOOM** wire transferred $69,620 to the arms manufacturer's account in Virginia.

11.  On or about August 24, 2004, Co-conspirator Four sent the following e-mail, which reads in relevant part:

> **From:** [Co-conspirator Four]
> **To:** [Defendant **BLOOM**]
> **Cc:** [Stein]; [Person F]
> **Sent:** Thursday, August 26, 2004 3:31 PM
> **Subject:** car for [Co-conspirator Four]
>
> [Defendant **BLOOM**]
>
> I just got a call from the comptroller at the dealership. The final payment has been transferred. I have to pay $3,111.50 for tax and title. The dealership has informed me that the car is available for my pick up.
>
> As an FYI [Person F] has been calling me on a regular basis and has emailed and spoken directly to the dealership comptroller. I know there was a problem with the wire transfer from the bank in Cyprus.
>
> I'll let you know when I actually pick up the car. At that point you'll get a great big thank you and I owe you from me. [].
>
> [Co-conspirator Four]

mm.  On or about September 2, 2004, Co-conspirator Four sent the following e-mail:

> **From:** [Co-conspirator Four]
> **To:** [Defendant **BLOOM**]
> **Sent:** Thursday, September 02, 2004 1:55 PM
> **Subject:** Re: update
>
> [Defendant **BLOOM**]

The truck is Great!!! I needed a new truck. My old
truck is a 1991 with well over 150,000 miles on it.
People I work with cannot stop commenting on how much
they love it. It drives real smooth like a sedan.
As you know, Bob and I stay in touch. He told me the
way these State Dept guys are jerking you around. I
think (as does Bob and my team mate [Person K]) that
they're going to close CPA SC soon. In my opinion it
won't be soon enough. So these guys have nothing to do
and there's no future in where they're working anyway.
I have a very good friend who served with me in Bosnia.
He is working for the State Dept. He said there is a
huge number of vacancies for Baghdad and Kuwait. The
State Dept can't get anyone to serve there. That means
they'll have to start closing these places. They can't
keep them staffed. So don't worry about the State Dept
jerks. If there were any smoking guns, they would have
been found months ago.

Take care of yourself and make sure you stay safe over
there. Nothing in Iraq is worth dying for.

[Coconspirator Four]

nn.  On or about September 3, 2004, Coconspirator Four sent

an e-mail which reads in relevant part:

**Subject: email test**
**From:** [Co-conspirator Four]
**Date:** Fri, 3 Sep 2004 19:47:58  0700 (PDT)
**To:** [Stein]

OK  Bob

Did you get this message?  I'll send you what you need,
but we need to talk.  Can I count on [Defendant **BLOOM**]
for payback? I have nothing other than what I carried
out.  I have no investments like you do and I get paid
badly where I work.  You know I'm your friend and I
will always stand by you, but I need to know how much
I'll end up with in the end.

\*   \*   \*

[Co-conspirator Four]

22

oo.  In return for his co-conspirators violating CPA and DOD procurement regulations and other laws in order to steer contracts to him and his companies and arrange for payment to him on those contracts, on or about the following dates, Defendant **BLOOM** caused the following wire transfers of funds to be sent to Stein or his spouse or others acting on **STEIN**'s behalf, or to **STEIN**'s coconspirators or their spouses or others acting on their behalf, from foreign bank accounts Defendant BLOOM controlled:

| Date | Amount | Description |
|------|--------|-------------|
| 1/15/04 | $30,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 1/27/04 | $6,500 | Transfer for benefit of **STEIN** (for the purchase of jewelry, from a jeweler in North Carolina) |
| 1/29/04 | $70,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 2/9/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/9/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 2/17/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 3/2/04 | $50,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 3/3/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $15,000 | Transfer for benefit of **STEIN** (for the purchase of jewelry) |
| 3/15/04 | $50,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |

| 3/29/04 | $140,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
|---|---|---|
| 3/29/04 | $100,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 4/7/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Romania to a bank in California) |
| 4/26/2004 | $9,475 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/27/04 | $1,973 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 4/28/04 | $60,017 | Transfer for benefit of **STEIN** (for the purchase of an automobile) |
| 5/3/04 | $40,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 5/3/04 | $25,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 5/3/04 | $35,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 5/5/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/2/04 | $35,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
| 6/3/04 | $5,523 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 6/4/04 | $44,261 | Transfer for benefit of Co-conspirator Two (for the purchase of an automobile) |
| 7/6/04 | $20,000 | Transfer for benefit of **STEIN** (for the purchase of real estate in Hope Mills, North Carolina) |
| 7/6/04 | $25,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |
| 7/6/04 | $75,000 | Transfer for benefit of **STEIN** (from a bank in Iraq to a bank in North Carolina) |

| 7/6/04 | $10,000 | Transfer for benefit of Co-conspirator Two (from a bank in Iraq to a bank in California) |
|--------|---------|------|
| 7/20/04 | $14,968 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from a bank in Cyprus to an automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to an automobile dealer in New Jersey). |
| 9/13/04 | $124,962 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 9/27/04 | $30,000 | Transfer for benefit of **STEIN** (from a bank in Switzerland to a bank in North Carolina) |
| 9/30/04 | $8,472 | Transfer for benefit of **STEIN** (for the purchase of a recreational vehicle) |
| 10/20/04 | $33,000 | Transfer for benefit of **STEIN** (from a bank in Switzerland to a bank in North Carolina) |

pp. In order to promote the ongoing fraud conspiracy alleged in Count 1 of the Information and to conceal the source, nature, origin, ownership and control of the proceeds of specified unlawful activity, Defendant **BLOOM** caused wire transfers or other financial transactions to be sent from foreign bank accounts that he owned or controlled to bank accounts that

Stein and others controlled, including all of the transactions delineated in paragraph oo above.

qq.  Defendant **BLOOM** and others engaged in monetary transactions in criminally derived property of a value greater than $10,000, by through or to a financial institution, with such property being derived from the specified unlawful activities in the Information, including but not limited to the following transactions in the approximate amounts and dates listed below:

| Date | Amount | Description |
|------|--------|-------------|
| 1/22/04 | $19,500 | Payment to a law firm for the benefit of Stein. |
| 2/9/04 | $34,791 | Payment to a North Carolina automobile dealer for the benefit of Stein. |
| 2/13/04 | $40,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 3/3/04 | $15,000 | Payment to a North Carolina jewelry company for the benefit of Stein. |
| 3/15/04 | $15,000 | Payment to a North Carolina jewelry company for the benefit of Stein. |
| 4/21/04 | $19,311 | Payment to a home improvements company for the benefit of Stein. |
| 4/28/04 | $60,017 | Payment to a car dealer for the benefit of Stein. |
| 6/2/04 | $22,024 | Payment to a motorcycle dealer for the benefit of Co-conspirator Two. |
| 8/2/04 | $107,000 | Interbank transfer for the benefit of Co-conspirator Two. |
| 8/3/04 | $80,000 | Transfer to investment account for the benefit of Co-conspirator Two. |
| 9/16/04 | $10,527 | Payment to a cabinet company for the benefit of Co-conspirator Four. |
| 10/8/04 | $30,971 | Payment to a North Carolina auto dealer for benefit of Stein. |

| 11/11/04 | $11,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 4/8/05 | $20,000 | Transfer from investment account for the benefit of Co-conspirator Two. |

rr.   Defendant **BLOOM**'s co-conspirators, including Stein, Co-conspirator Four and others, structured payments to home improvements companies, car dealerships and others in an attempt to avoid scrutiny by the Internal Revenue Service and others, to evade the reporting requirements of federal law, and in attempt to evade the threshold of 18 U.S.C. § 1957.  Such transactions include the following in the approximate amounts and dates listed below:

| Date | Amount | Description |
|---|---|---|
| 8/10/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/19/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/24/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 8/25/04 | $9,348 | Transfer for benefit of Co-conspirator Four (from bank in Cyprus to automobile dealer in New Jersey). |
| 10/5/04 | $9,655 | Payment to home improvements company for the benefit of Stein. |
| 10/7/04 | $9,655 | Payment to home improvements company for the benefit of Stein. |

| 10/11/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
|----------|--------|-----------------------------------------------------------------------------------|
| 11/12/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 11/24/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |
| 12/15/04 | $9,000 | Cash payment to home improvements company for the benefit of Co-conspirator Four. |

ss.  In carrying out the crimes charged in the
Information, Defendant BLOOM obtained property,
including but not limited to military equipment and
protective security detail items, including but not
limited to body armor, protective vests, helmets and
weapons.

tt.  In carrying out the crimes charged in the
Information, Defendant BLOOM's criminal activity,
including money laundering, was facilitated through
the use of the, but not limited to, the following
bank account: Account 19212 at Bank Hofman
(Switzerland).

DATED: _____2-1-06_____, 2006, at Washington, DC.


FOR THE Defendant

_____
PHILIP BLOOM
Defendant


_____
Robert A. Mintz, Esq.
Geoffrey n. Rosamond, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 639-7916

John N. Nassikas, Esq.
John M. Gurley, Esq.
Arent Fox PLLC
1050 Connecticut Ave., NW
Washington, DC 20036
(202) 857-6014


FOR THE UNITED STATES


Richard Weber, Chief
Chief
Asset Forfeiture and Money
Laundering Section

Andrew Lourie, Acting Chief
Public Integrity Section

Paul Pelletier, Acting Chief
Fraud Section

By: _____
Mark J. Yost, Trial Attorney
Patrick Murphy, Trial Attorney
Asset Forfeiture and Money
Laundering Section

By: _____
James A. Crowell IV, Trial Attorney
Ann C. Brickley, Trial Attorney
Public Integrity Section

United States Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, DC 20005
Mark.Yost@usdoj.gov
Patrick.Murphy@usdoj.gov
James.Crowell@usdoj.gov
Ann.Brickley@usdoj.gov


29