# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 06-053 (CKK)** |
| | ) | |
| PHILIP H. BLOOM, | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

## DEFENDANT PHILIP H. BLOOM'S REQUEST FOR A DETENTION HEARING AND MOTION TO IMPOSE CONDITIONS OF RELEASE

Defendant Philip H. Bloom, pursuant to Loc. Crim. R. 47, Fed. R. Crim. P. 46, and 18 U.S.C. § 3143, requests a detention hearing and moves this Court for an Order releasing him before sentencing with conditions determined by the Court. As set forth fully in Mr. Bloom's Memorandum of Points and Authorities in Support of this Motion, Mr. Bloom will neither flee nor endanger the community, and conditions can be set that will reasonably assure his appearance at sentencing. The Court should therefore grant this Motion and the proposed Order.

Respectfully submitted,

John N. Nassikas III (Bar No. 387167)
John Gurley (Bar No. 396894)
ARENT FOX PLLC
1050 Connecticut Ave., N.W.
Washington, DC 20036-5339
(202) 857-6000 (Telephone)
(202) 857-6395 (Fax)

**OF COUNSEL:**

Timothy P. Kane, Esquire
ARENT FOX PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5339
(202) 857-6000 (Telephone)
(202) 857-6395 (Fax)

Dated: April 7, 2006

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 06-053 (CKK) |
| | ) | |
| PHILIP H. BLOOM, | ) | FILED UNDER SEAL |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT PHILIP H. BLOOM'S
## MOTION TO IMPOSE CONDITIONS OF RELEASE

Defendant Philip H. Bloom, pursuant to Loc. Crim. R. 47, Fed. R. Crim. P. 46, and 18 U.S.C. § 3143, respectfully submits this Memorandum of Points and Authorities in Support of his Motion to Impose Conditions of Release pending sentencing.

## I.    INTRODUCTION

On November 13, 2005, Mr. Bloom returned to the United States from Romania on a business trip. On his arrival at Newark International Airport, government agents detained, then arrested Mr. Bloom as part of their investigation into contracting fraud in Iraq. On November 15, 2005, Mr. Bloom was transferred to Washington, D.C. He was initially incarcerated at the D.C. Jail, but since early December, Mr. Bloom has been held in the protective custody unit of the Correctional Treatment Facility ("CTF").

Beginning from the time of his initial detention and continuing without exception until the present, Mr. Bloom has cooperated fully and honestly with the government. His cooperation culminated in a plea agreement, and on March 10, 2006, this Court accepted Mr. Bloom's guilty plea to the three charges brought against him by the government.

In the five months preceding this Motion, Mr. Bloom waived his right to a prompt detention hearing in order to focus fully on cooperating and reaching a just plea agreement with the government. Had Mr. Bloom exercised his statutory right to a bail hearing within the first few days of his arrest and the court had set conditions of release reasonably to ensure his future appearance, there is little doubt that Mr. Bloom's conditions would have remained in effect after his plea pending sentencing. Now that his plea has been entered, Mr. Bloom seeks what he could have received last November: release under conditions that will reasonably ensure his future appearance.

## II.     STATEMENT OF FACTS

### A. Personal History

Philip Bloom is a 66-year-old American citizen who grew up in the New York City metropolitan area. Mr. Bloom has a close relationship his adult son, Christopher Bloom, who lives in Bernardsville, New Jersey, and visits him at CTF on a regular basis. Mr. Bloom's brother, Elliot Bloom, sister-in-law, Phyllis Bloom, and nephew, Neal Bloom, live in Warwick, Pennsylvania and have close relationships with Mr. Bloom. He also has the support of his other nephew, Adam Bloom, and his family, who live in New Hope, Pennsylvania.

Mr. Bloom is a successful, self-made businessman who has lived in the United States for most of his life, including in the Washington, D.C. area in the 1960's. In the late 1970's, he operated a freight business in Miami and Haiti. During the 1980's, he founded and operated an airline in Miami and Puerto Rico. Mr. Bloom moved to Bucharest, Romania in 1994 where he started a company, Global Business Group, that later did contracting work as part of the reconstruction of Iraq. He lived in Bucharest for the next 11 years, where he owns a home, has close friends and family, and operated one of the largest companies in the city.

While living in Romania, Mr. Bloom was active in his community and is rightly proud of having organized and financed the first Little League baseball program in the country. He also organized youth hockey tournaments between Romanian and American teams. Through his company, he provided scholarships to Romanian children to attend college in the United States. In the late 1990's, he co-founded Democrats Abroad Romania and was a delegate at the 2000 Democratic National Convention.

Last July, Mr. Bloom's girlfriend, Anda Macarescu, gave birth to their daughter, Susan Anna Bloom, in Bucharest. Mr. Bloom and Ms. Macarescu plan to reunite their young family in Washington, D.C., if this Court approves Mr. Bloom's conditional release.

In 1998, Mr. Bloom began having regular, professional contact with members of the Arent Fox PLLC law firm ("Arent Fox") in Bucharest. Although Arent Fox never represented him before this case, this prior relationship established a foundation for the trust and respect that Mr. Bloom has in Arent Fox to guide him through the process of cooperating with the government.

## B. Mr. Bloom's Finances

As part of his ongoing extensive cooperation, Mr. Bloom and his attorneys have provided detailed information and documentation of his personal and business assets to the U.S. government. Through his counsel, he has voluntarily retrieved and produced from Iraq and Romania the hard drives of his personal and business computers, and CD's containing tens of thousands of documents relevant to the government's wide-ranging investigations. In addition, in November 2005, the Romanian Prosecutor's Office of the High Court of Cassation and Justice (the "Romanian Prosecutor") initiated an investigation with which Mr. Bloom has also cooperated fully. Pursuant to these investigations, Mr. Bloom's personal bank assets have been

3

sequestered or seized by prosecutors in the United States and Romania. Mr. Bloom's business and personal bank accounts are detailed in the attached Exhibit A.

### C. Mr. Bloom's Cooperation

Mr. Bloom is committed to continuing his cooperation with the government and has no intent to flee. He deeply regrets his involvement in the criminal activity and knows that the only way to lessen his sentence is to cooperate fully and truthfully with the government's investigations. Mr. Bloom already has met on multiple occasions with more than a dozen government prosecutors and investigators. He is a critical cooperator in the fraud and public corruption investigations of important government officials, among others. He likely will be a key witness in any future trials and will be responsible for future plea agreements. Indeed, in light of the scope and quality of Mr. Bloom's cooperation and the extensive documentation he has preserved and produced, he could potentially receive a significant downward departure under the advisory sentencing guidelines.

By keeping Mr. Bloom incarcerated at CTF, however, his value as a witness is limited. Mr. Bloom is a business executive in his mid 60's, facing sentencing for nonviolent crimes. He is simply not capable of physically and psychologically coping with the unhealthy, unsafe, and demoralizing conditions of CTF for an extended period of time while trying simultaneously to meet the government's understandable demands to debrief, to recall details of past events, to review documents, and eventually, to testify. In the protective custody unit, Mr. Bloom has received only a few hours of fresh air each month, and he is housed with convicted murderers and other violent felons. To attend 9:00 a.m. debriefings at the courthouse, Mr. Bloom is awakened from his cell at 2:00 a.m. Throughout the debriefings, Mr. Bloom's hands, ankles, and waist are shackled despite prosecutors' requests to the Marshals that his hands be released so that

he can handle documents, take his eyeglasses on and off, and so forth. Inevitably, Mr. Bloom is exhausted, stressed, and somewhat unfocused as a result of these harsh conditions. In addition, Mr. Bloom is not permitted visits, including legal visits, from 11:30 a.m. until 8:00 p.m., Monday through Thursday. Given the protracted nature of the government's investigations, Mr. Bloom's physical and mental health – and his consequent ability to assist with the government – will inevitably suffer if he remains incarcerated at CTF.

If Mr. Bloom is released on bail, he could be placed on electronic monitoring at his expense in a residence in Washington, D.C., near both his counsel and the government attorneys and agents. The government could thereby meet with Mr. Bloom at any time and under favorable conditions. Mr. Bloom's physical, emotional, and psychological health would be improved, and his ability to be an effective government witness would be preserved and enhanced.

Mr. Bloom's family is extremely supportive of his cooperation with the government and will post their assets to ensure that he follows any conditions of release. Elliot and Phyllis Bloom will post their home in Warwick, Pennsylvania. The value of this home is $350,000, and it represents their primary asset. See E. Bloom Decl., attached as Exhibit B. Mr. Bloom's son, Christopher Bloom, will forfeit all of his assets, including his bank accounts and personal property, if Mr. Bloom fails to appear at future court proceedings. These commitments reflect the confidence Mr. Bloom's family has in his trustworthiness if he is released on bail and provides powerful release conditions, more than reasonably assuring Mr. Bloom's future appearance at these proceedings.

### III.    MR. BLOOM IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY.

The Bail Reform Act of 1984 provides that a defendant awaiting sentencing shall be released where the court finds by clear and convincing evidence that the person is "not likely to flee or pose a danger" to the community. 18 U.S.C. § 3143(a). In determining whether a defendant awaiting sentencing is likely to flee or to endanger the community, courts rely on various factors, including those enumerated in 18 U.S.C. § 3142: (1) the nature and circumstances of the offense…;[1] (3) the history and characteristics of the defendant; and (4) the nature and seriousness of danger posed to any person or to the community. 18 U.S.C. § 3142(g); U.S. v. Majors, 932 F.Supp. 853, 855 (E.D. Tex. 1996) (relying on § 3142(g) factors in releasing defendant pending sentencing).[2]

The primary consideration in analyzing the nature and circumstances of the offense is whether the offense is a crime of violence or a drug offense. 18 U.S.C. § 3142(g)(1); see also U.S. v. Karni, 298 F.Supp.2d 129, 131 (D.D.C. 2004). Some courts also consider the length of a defendant's potential sentence in weighing the likelihood of flight. See U.S. v. Jones, Crim. No.

---

[1] The second factor enumerated in 18 U.S.C. § 3142(g), "the weight of the evidence," is generally not an issue after conviction.

[2] Because there are no D.C. Circuit or District cases directly on point, this motion cites cases addressing conditional release in three different situations: pre-trial, after trial pending sentencing, and after sentencing pending appeal. The latter two situations require courts to weigh the facts under the standard applicable here: clear and convincing evidence that the defendant is unlikely to flee or endanger the community. However, where defendants seek release after sentencing pending appeal, or where defendants seek release pending sentencing for crimes of violence, capital crimes, and certain drug crimes, the defendants must make additional showings that are not required here.

85-0412, 1987 WL 11983 at *2 (D.D.C. 1987); U.S. v. Salvagno, 314 F.Supp.2d 115 (N.D.N.Y. 2004). In analyzing a defendant's history and characteristics, the statute directs courts to consider, "(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law." 18 U.S.C. § 3142(g)(3).

### A. Mr. Bloom Will Not Flee.

A defendant is not likely to flee simply because the theoretical possibility of flight exists; a defendant is likely to flee only if he has an inclination to do so. See Truong Dinh Hung v. United States, 439 U.S. 1326, 1329 (1978) (Brennan, J., as Circuit Justice) (granting conditional release pending appeal after finding, where appellant maintained contact with Vietnamese Ambassador in Paris, did not have a permanent residence in the United States, and would be beyond the reach of U.S. law enforcement if he fled to Vietnam, that the facts established only a flight opportunity, but *not* any inclination on the part of the appellant actually to flee). The evidence here is clear and convincing that Mr. Bloom will not flee if released on bail. Indeed, in cases with similar facts, courts find that defendants are unlikely to flee. See U.S. v. Quinn, No. Crim. 05-0018 (JDB), 2006 WL 465380 (D.D.C. February 28, 2006) (releasing defendant after finding clear and convincing evidence that he was not a flight risk and not a danger to the community pending appeal of his 39-month sentence for conspiracy and illegally exporting goods to Iran); see also U.S. v. Mahabir, 858 F.Supp. 504 (D. Md. 1994) (finding clear and convincing evidence that defendant was not likely to flee or to pose a danger to the community

pending sentencing, but denying conditional release under the heightened statutory standard applicable to capital offenses, crimes of violence, and certain drug crimes).

In Mahabir, the defendant was convicted on drug charges in connection with the government's seizure of almost 200 kilograms of cocaine. 858 F.Supp. at 505-06. Although a resident of the United States, the defendant was a native of Trinidad and faced a very long sentence. See id.; see also U.S. v. Mahabir, 114 F.3d 1178 at *2 (4th Cir. 1997) (noting that defendant received a 188-month sentence) (unpublished opinion, attached hereto as Exhibit C). His family, some of whom lived outside of the United States, was supportive of the defendant and pledged properties in New Jersey and New York as surety for his release. Mahabir, 858 F.Supp. at 507. While out on bail during trial, the defendant was a model supervisee. Id. Under these facts, the court found clear and convincing evidence that the defendant was not likely to flee before sentencing. Id. The facts are similar here. Although Mr. Bloom has lived abroad for the last 11 years, he is an American citizen, has spent most of his life in the United States, and has close friends and family here. As in Mahabir, Mr. Bloom's family will pledge property as surety for his release, and Mr. Bloom has been a model of cooperation before and since his plea agreement. Finally, under the advisory sentencing guidelines and the plea agreement, Mr. Bloom faces a significantly shorter sentence than the defendant in Mahabir.

Salvagno also provides guidance. See 314 F.Supp.2d 115 (granting defendants conditional release pending sentencing). In Salvagno, the court found clear and convincing evidence that the defendants were not likely to flee after conviction. Id. at 117. The court made this finding even though the defendants, like Mr. Bloom, faced substantial prison sentences, were affluent, and had family ties abroad. Id. at 115. Like the Salvagno defendants, Mr. Bloom has no inclination to flee.

8

Although analyzed under the pre-trial release standard of 18 U.S.C. § 3142, Karni likewise provides instructive guidelines for conditional release on bond. 298 F.Supp.2d 129. In Karni, the court released the defendant on bond despite finding that the defendant had *no ties* to the Washington, D.C. area or even to the United States; that the alleged crimes involved acquiring and exporting nuclear weapon triggering devices to Pakistan; and that the weight of evidence against the defendant was substantial. Id. at 130-32. Here, as described above, Mr. Bloom's ties to the community are far greater than in Karni. As in Karni, the charges here are nonviolent but serious. And here, of course, Mr. Bloom does not contest the evidence against him; he has admitted his role in these crimes and is cooperating fully with the government.

The case law thus establishes that Mr. Bloom is not likely to flee.[3] The nature and circumstances of Mr. Bloom's offenses further support this conclusion. The offenses here do not include a crime of violence and are not drug-related. In addition, although Mr. Bloom faces a potential sentence of 108 to 135 months under the advisory guidelines, he understands that the only way to lessen his sentence is by cooperating fully with the government. He knows that any attempt at flight would greatly increase his sentence and eliminate the realistic prospect, given his immediate and continuing substantial assistance to the government, of a significant reduction in his sentence under § 5K1.1 of the Sentencing Guidelines or Fed. R. Crim. P. 35. The nature

───────────────────

[3] Cases where courts denied release are readily distinguishable. See, e.g., U.S. v. Anderson, 384 F.Supp.2d 32 (D.D.C. 2005) (denying defendant's request for pre-trial release). In Anderson, the defendant used numerous aliases and false identities; demonstrated a clear interest in fleeing; was persistently deceitful in his dealings with the government; and had access to substantial untraceable overseas assets. Id. at 36. Here, on the other hand, Mr. Bloom has no aliases; has evidenced no intention of fleeing; has been persistently truthful and helpful in his dealings with the government; and his overseas assets are under the control and/or supervision of the U.S. and Romanian prosecutors.

and circumstances of the offenses therefore weigh heavily in establishing that Mr. Bloom is not likely to flee.

Mr. Bloom's personal history and characteristics likewise establish that he is not likely to flee. Mr. Bloom is a loving father and a successful businessman who deeply regrets his involvement in the criminal activity underlying this case. Mr. Bloom's cooperation with the government, beginning at his initial detention in Newark before he even had retained counsel, and continuing until the present, demonstrates his genuine remorse and commitment to taking full responsibility for his actions. Because his character and conduct have been exemplary from arrest through entry of plea, his conditional release will encourage similarly cooperative behavior by other defendants and counsel in the future.

In addition, as discussed above, Mr. Bloom has close family relationships, positive ties to his community, and no history of violence or substance abuse. Indeed, he does not even drink alcohol. As a successful business executive, Mr. Bloom could support himself and his family while on conditional release. Because his funds are being monitored and controlled by the U.S. and Romanian prosecutors, however, Mr. Bloom would not have the financial resources to sustain the life of an international fugitive. In any event, Mr. Bloom is willing to waive his extradition rights in Romania, Haiti, and in any other country deemed appropriate by the Court.

Mr. Bloom has only one prior arrest. In 1990, he was charged with issuing bad checks and a related count of theft in Somerset County, New Jersey, stemming from his misguided attempts to make mortgage payments and support his family during a time of extreme financial hardship. His behavior in that case demonstrates his commitment to taking complete responsibility for his actions. Mr. Bloom pled guilty to all of the charges, paid restitution, was incarcerated for about three months, and then participated in a home detention program. His

perfect attendance record in court and his successful completion of the home detention program indicate that he is an excellent candidate for home detention pending sentencing in this case.[4]

Finally, at the time of Mr. Bloom's arrest in the instant case, he was not on probation, parole, or other release relating to another offense. In light of these facts, Mr. Bloom's personal history and character demonstrate that he will not flee.

### B. Mr. Bloom Will Not Endanger The Community.

Mr. Bloom obviously will not be a danger to anyone if he is released on bail. Where a defendant has no history of violence or substance abuse, and where the defendant has positive ties to his community (even an overseas community), release on bail does not present a danger to the community. See Karni, 298 F.Supp.2d 129 (releasing defendant on bond under 18 U.S.C. § 3142 where the defendant was charged with nonviolent crimes and had close ties to his community in Cape Town, South Africa). Mr. Bloom is 66 years old, has no history of violence or substance abuse, and is not facing sentencing for violent or drug-related crimes. In addition, Mr. Bloom has a long history of positive ties with his community. In Bucharest, he ran a successful company and organized the first Little League baseball program in the country. In earlier years, Mr. Bloom was a Peace Corps volunteer in the Philippines for two and a half years and worked for the Cooperative for Assistance and Relief Everywhere (CARE) in Yugoslavia for more than two years. Mr. Bloom's personal history demonstrates that he is not a danger to the community.

---

[4] Courts grant conditional release to defendants with far more serious criminal histories. See, e.g., Majors, 932 F.Supp. 853, 856 (granting conditional release pending sentencing to a defendant with a prior conviction for rape and a prior arrest for felony theft).

## IV. THERE ARE CONDITIONS THAT WILL REASONABLY ASSURE MR. BLOOM'S APPEARANCE AT SENTENCING AND THE SAFETY OF THE COMMUNITY.

Upon a finding that a defendant is not likely to flee or endanger the community, a court should release the defendant under conditions that reasonably assure both the required appearance of the person and the safety of the community. 18 U.S.C. § 3143(a) (referencing 18 U.S.C. § 3142(b) and (c)). As the D.C. Circuit has explained, conditional release requires "conditions that will reasonably assure appearance, not guarantee it." United States v. Xulam, 84 F.3d 441, 444 (D.C. Cir. 1996).[5]

Courts, including in Salvagno and Karni, regularly devise conditions of release for defendants under similar facts as are present here.[6] The Salvagno court ordered the following conditions of release:

    1. Bonds posted on family-owned real property;

---

[5] See also Banks v. United States, 414 F.2d 1150, 1153 (D.C. Cir. 1969) (structuring conditions of release "to allow for maximum amount of supervision over appellant, while still allowing for his freedom from incarceration" after appellant's conviction for robbery and assault with a deadly weapon); United States v. Alston, 420 F.2d 176, 178 (D.C. Cir. 1969) (stating that "[t]he law requires reasonable assurance but does not demand absolute certainty" and granting pre-trial release to armed robbery defendant).

[6] See also United States v. Al-Timimi, Case No. 04-385A (E.D. Va.) (releasing defendant after conviction on ten terrorism-related counts under the following conditions: (1) travel restricted to the D.C. metro area; (2) regular reporting to Pretrial Services; (3) a $75,000 bail bond; (4) surrender of his passport(s); and (5) electronic monitoring, where defendant faced a mandatory multi-decade sentence) (see orders, attached hereto as Exhibit D); United States v. Lawrence Franklin, Case No. 05-309-MJ (E.D. Va.) (allowing defendant who was convicted and sentenced to 12 years of imprisonment on espionage-related charges to be released on bond, pending the results of his cooperation with the government, under the following conditions: (1) travel restricted to the D.C. metro area, Michigan, and Texas; (2) regular reporting to Pretrial Services; (3) a $100,000 bail bond; and (4) surrender of his passport(s)) (see Order Setting Conditions of Release, attached hereto as Exhibit E).

    2.  Electronic monitoring;

    3.  Travel restrictions;

    4.  Surrender of passports; and

    5.  Extradition waivers signed by the defendants.

314 F.Supp.2d at 116-17.

    In <u>Karni</u>, the court recognized a risk, due to "the absence of connections" tying the defendant to the United States, that the defendant would flee.  298 F.Supp.2d at 132.  The court nonetheless found that the following conditions would ensure the defendant's continued presence in the D.C. area:

    1.  Home detention in a Hebrew sheltering home in Silver Spring, Maryland;

    2.  Participation in the electronic monitoring program (with approved absences);

    3.  A signed waiver of extradition rights under the treaties with the countries of the defendant's prior residence;

    4.  $175,000 in posted bonds ($100,000 of which was provided by the defendant); and

    5.  Release of the defendant into the custody of the Rabbi of the Hebrew sheltering home.

<u>Id.</u> at 132-33.  Similar release conditions are appropriate here and would ensure Mr. Bloom's continued presence in Washington, D.C.

    Mr. Bloom is well aware of the severe consequences if he attempts to flee, and he knows that it would be impossible to hide.  Even without severe consequences, Mr. Bloom would have every intention of remaining in Washington, D.C. to cooperate with the government and his attorneys, and to meet the obligations of his plea agreement.  Mr. Bloom nonetheless recognizes the government's significant interest in his continued cooperation and invites the Court to devise

conditions of release that adequately address the government's concerns. Taking guidance from

Salvagno, Karni, and similar cases, Mr. Bloom proposes the following conditions of release:

1. Mr. Bloom will obtain, live in, and be subject to home detention in an apartment in Washington, D.C.

2. Mr. Bloom will be subject to electronic monitoring.

3. Mr. Bloom's brother, Elliot Bloom, and sister-in-law, Phyllis J. Bloom, will post their home located at 403 Silver Oak Court, Warwick, PA 18974 to secure Mr. Bloom's presence at future court proceedings.

4. Mr. Bloom's son, Christopher Bloom, will agree to forfeit his cash assets and personal property in the event that Mr. Bloom fails to appear for a future court proceeding.

5. Mr. Bloom will agree to forfeit his home located at 17 Arch Louis Blanc, Bucharest 1, Romania in the event that he fails to appear for a future court proceeding. This home has recently been appraised at a value of approximately $975,000 (820,000 Euros). See appraisal, attached as Exhibit F.

6. Mr. Bloom will report regularly by telephone to the U.S. Probation Office or another agency designated by the Department of Justice.

7. Mr. Bloom will be available to government prosecutors and investigators for debriefings and meetings, 24 hours a day, 7 days a week.

8. Mr. Bloom will be restricted in travel, with specific parameters to be determined, but in no event will Mr. Bloom travel outside of his electronic monitoring radius without prior approval from the Department of Justice or the Court.

9. The United States Marshals Service or the Court, as appropriate, will retain possession of Mr. Bloom's passports, which he gave up at the time of his initial detention last fall.

10. Mr. Bloom will execute waivers of extradition rights under the extradition treaties between Romania and the United States, and between Haiti and the United States.

These conditions would ensure that Mr. Bloom will remain in Washington, D.C. pending

sentencing and fulfill the obligations of his plea agreement.

## V.    CONCLUSION

For the foregoing reasons, Philip Bloom respectfully requests that this Court grant his

Motion to Impose Conditions of Release and release him from custody pending sentencing

pursuant to the attached proposed Order.

Respectfully submitted,

John N. Nassikas III  (Bar No. 387167)
John Gurley  (Bar No. 396894)
ARENT FOX PLLC
1050 Connecticut Ave., N.W.
Washington, DC 20036-5339
(202) 857-6000 (Telephone)
(202) 857-6395 (Fax)

**OF COUNSEL:**

Timothy P. Kane, Esquire
ARENT FOX PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
(202) 857-6000 (Telephone)
(202) 857-6395 (Fax)

Dated:    April 7, 2006