UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 06-053 (CKK) |
| ) | |
| PHILIP H. BLOOM, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT PHILIP BLOOM'S REPLY MEMORANDUM
IN SUPPORT OF HIS MOTION TO IMPOSE CONDITIONS OF RELEASE**

On April 7, 2006, Defendant Philip Bloom filed a Motion to Impose Conditions of Release (the "Motion"), seeking his release pending sentencing. On April 17, 2006, the government submitted its Response to Defendant's Motion to Impose Conditions of Release (the "Government Response"), opposing his release for the unsubstantiated reasons that Mr. Bloom might "injure himself" or flee. The Government's speculation is contradicted by clear and convincing evidence, detailed in Mr. Bloom's Motion and this Reply, establishing that Mr. Bloom has neither the desire nor the ability to flee and that the proposed release conditions will more than reasonably assure his future appearance.

**I.   INTRODUCTION**

The sole question before the Court is whether Mr. Bloom has shown by clear and convincing evidence that he is not *likely* to flee, particularly in light of the significant conditions proposed, or to endanger other people or the community. See 18 U.S.C. § 3143(a) & § 3142(c). Mr. Bloom's request for conditional release meets and exceeds this standard. Specifically, Mr. Bloom has proffered the following:

> 1. Mr. Bloom's valuable, complete, and truthful cooperation with the government for more than five months demonstrates his credibility and good-faith intention to fulfill his obligations to this Court and to his plea agreement.

    2. Mr. Bloom reasonably believes that his ongoing provision of substantial assistance to the government in the investigation and prosecution of other persons who have committed federal offenses will result in a significant reduction of his sentence under the advisory guidelines.

    3. Family members are extremely supportive of Mr. Bloom and are willing to post their assets to secure his release.

    4. Mr. Bloom's personal and business assets are completely transparent to the government, and with the assistance of counsel, Mr. Bloom has responded and continues to respond to all related government inquiries.

    5. Mr. Bloom is a successful, serious, well-grounded businessman who has a long history of positive ties to his community.

    6. Mr. Bloom is an American citizen who has lived most of his life in this country.

    7. Mr. Bloom has no history of mental illness, violence, substance abuse, or alcohol abuse.

    8. Mr. Bloom was not on probation, parole, or other release at the time of his arrest, and he has no history of failing to appear in court.

    9. Mr. Bloom proposes a strict set of conditions for release, including home detention, electronic monitoring (at his cost), bond,[1] waivers of extradition, travel restrictions, and surrender of his passports.

The government concedes many of these points. Indeed, the government acknowledges Mr. Bloom to be an "effective" and "necessary" witness in its "anti-corruption efforts in Iraq," whose cooperation will have a "significant" impact on future prosecutions. (Gov't Resp. 8, 16.) The government further agrees that Mr. Bloom's proposed conditions of release are "significant." Id. at 16. In an effort nevertheless to justify Mr. Bloom's continued detention, the government reverts to speculation and innuendo to raise unfounded concerns about Mr. Bloom's

---

[1] In addition to the family members offering to post assets as discussed in the Motion, Victoria McManus, Mr. Bloom's former wife, will post her home in New Jersey as surety for his release.

2

intentions and ability to flee. These speculations are unsupported and directly contradicted by the clear and convincing evidence before this Court that Mr. Bloom is not a flight risk and has absolutely no intention of fleeing, and that the Court can impose a combination of conditions that will reasonably assure his appearance as required.

## II.   DISCUSSION

Mr. Bloom and the government agree that evidence in detention proceedings may be presented by way of proffer. See id. at 6 (citing United States v. Karni, 298 F.Supp.2d 129, 131 (D.D.C. 2004)). The Court must nonetheless scrutinize these proffers to "ensure the reliability of the evidence." United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).

Here, the government makes numerous allegations that are not supported by reliable evidence. Specifically, the government contends that Mr. Bloom expects to receive a life sentence; Mr. Bloom has significant assets hidden abroad; Mr. Bloom has operated international criminal enterprises for the last fifteen years and evaded the government's efforts to capture him; Mr. Bloom will kill himself if released; Mr. Bloom has non-U.S. passports; and, because of his sophistication, Mr. Bloom should be detained. Even modest scrutiny of these claims reveals them to be unfounded.

### A.   The Supposed "Life Sentence"

The government states that Mr. Bloom "effectively faces a life sentence," and therefore has a strong incentive to flee. (Gov't Resp. 16.) Mr. Bloom's plea agreement, however, provides that, subject to the Court's discretion, sentencing will be governed by the advisory guidelines with a likely initial range of 108 to 135 months. (Plea Agmt. 4.) The government further agreed to consider the nature and extent of Mr. Bloom's cooperation in deciding whether to request a downward departure, under § 5K1.1, from the applicable range. Id. at 11. The

3

government already acknowledges that Mr. Bloom "has been cooperating," is an "effective" and "necessary" witness, and will have a "significant" impact on future prosecutions. (Gov't Resp. 3, 8, 16.) Thus, the government itself is signaling the likelihood of a § 5K1.1 request for a significant downward departure at sentencing.

The government nonetheless contends that Mr. Bloom anticipates a "life sentence," and therefore may flee.[2] Id. at 16. The government cites United States v. Levine, 770 F.Supp. 460 (N.D. Ind. 1991), in support of its reasoning. In Levine, the defendant faced a sentence of life without parole if convicted of conspiring to murder three of his family members, two of whom were actually murdered. Id. at 461. The defendant already had fled and eluded capture by law enforcement by adopting aliases, changing his appearance, moving out of state, and cutting off contact with associates and family. Id. at 462-63. He repeatedly expressed and exhibited an intention to flee by, among other things, attempting to rent a condominium in Mexico under an assumed name, taking a crash course in Spanish, and failing to surrender on the date arranged by his attorney. Id. at 463-64. Based on those facts the court quite properly detained the defendant as a flight risk. Id. at 468.

The facts of Levine stand in utter contrast to those of this case. Mr. Bloom has been and continues to be cooperative with the government, he has fully disclosed his assets, his family members are willing to post significant assets to assure his future appearances, and he knows that the Court retains sentencing discretion. Mr. Bloom understands that a sentence in the guidelines

---

[2] The government does not attempt to explain why Mr. Bloom would voluntarily plead guilty to face a life sentence.

4

range without a downward departure is possible, and that, with a § 5K1.1 reduction, a sentence well below the guidelines range is likely. It is emphatically clear to Mr. Bloom that the only way to ensure the equivalent of a life sentence would be by attempting to flee, thereby jettisoning the evident benefit of his work over the past five months, and that the surest path to the most lenient sentence is to continue his valuable cooperation with the government—cooperation that began on his own initiative, without counsel, on November 13, 2005, the date of his arrest.

### B. Mr. Bloom's Assets

The government makes similarly unfounded claims regarding Mr. Bloom's assets. First, the government alleges, "considerable uncertainty regarding the extent of the Defendant's access to financial resources overseas, owing primarily to the fact that the Defendant has chosen to locate much of his assets in Switzerland and other jurisdictions with strong protections regarding the disclosure of financial information." (Gov't Resp. 12-13.) In truth, Mr. Bloom has only one bank account in a jurisdiction with ostensibly "strong protections" of financial information. That account is at Bank Hofmann in Switzerland, has been frozen through the efforts of the U.S. government, and is being voluntarily forfeited to the U.S. government pursuant to Mr. Bloom's plea agreement. In addition, Mr. Bloom has turned over to the government many pages of records regarding this account and other business and personal accounts in the U.S., Iraq, Turkey, and Romania. Mr. Bloom is willing and able to make whatever arrangements are necessary regarding these other accounts to satisfy this Court that he is not a flight risk.

Second, the government claims that Mr. Bloom's companies continue to "profitably operate and earn millions of dollars." Id. at 13. For the past several years, the primary client of Mr. Bloom's companies has been the United States government itself. His companies now have been barred from contracting with the government, and thus these companies are in dire financial

straits and are, in fact, losing money.  Third, the government speculates that Mr. Bloom "could easily" have deposited cash in a safety deposit box to aid him if he flees.  Id. at 14.  The government offers no evidence that Mr. Bloom has a safety deposit box, that he stashed away untold sums, or that he has made any statements or taken any actions at any time reflecting an intent to flee.  In fact, Mr. Bloom has no safety deposit box and has taken no actions of any kind that would suggest he has secreted funds to finance his flight.

The government's speculations belie the breadth of its knowledge about Mr. Bloom's life and finances.  Mr. Bloom has turned over more than 40,000 pages of documents from his personal and business records.  Through his attorneys, he retrieved from Iraq and Romania and turned over to the government the hard drives from his two computers, in addition to the laptop computer taken from him with his consent at the time of his arrest.  He has compiled and given to the government detailed information on his personal and business accounts.  Of course, the government also has detailed information from sources other than Mr. Bloom himself.

Inevitably, given the sheer volume of materials produced and his ownership of several different companies, the government finds references to financial transactions about which Mr. Bloom has no memory and for which records are more difficult to track down.  Pursuant to his cooperation, Mr. Bloom and his attorneys proactively investigate and respond to each such government inquiry.  In sum, Mr. Bloom has provided to the government voluminous personal and business records dating back several years, and none of these records reveal that Mr. Bloom has any significant undisclosed assets overseas.  Mr. Bloom has revealed to the government information regarding *all* of his significant assets and stands willing and able to provide any additional information deemed necessary by the Court.

### C. Mr. Bloom's Criminal History

The government alleges that Mr. Bloom has been operating "criminal enterprises" outside of the United States "for the last 11-15 years." (Gov't Resp. 12.) The government does not offer a single piece of evidence to support this vague but incendiary allegation. Indeed, elsewhere in its response, the government acknowledges that Mr. Bloom is, in fact, "a highly successful international businessman." Id.

The government makes a similarly inflammatory but unsupported allegation that Mr. Bloom has demonstrated an ability "to avoid capture by the government." Id. at 9.[3] The government asserts that it was "*only able to capture* the Defendant by placing him on an international watch list whereby the Defendant was captured in Newark, New Jersey while attempting to navigate United States customs." Id. at 13 (emphasis added). In truth, Mr. Bloom lived and worked openly in Iraq and Romania before his arrest. He worked in the Green Zone in Baghdad and conducted most of his business with the U.S government itself. It is ridiculous for the government now to assert that—although it could invade, govern, and reconstruct Iraq—it could not manage to "capture" an American citizen working in the Green Zone in close

---

[3] The government similarly alleges that Mr. Bloom practices "identity fraud" and cites two cases where the defendants eluded the government by using aliases. (Gov't Resp. 11-12 (citing United States v. Powell, 813 F.Supp. 903 (D. Ma. 1992) (detaining murder suspect under charges of felon in possession of firearm where defendant had history of failure to appear, "prodigious" criminal record, used aliases to evade criminal liability, was an alcoholic, and led an unstable life); United States v. Rodgers, 738 F.Supp. 156 (E.D. Pa. 1990) (detaining defendant where defendant faced life without parole for serious drug charges, used false names, and committed crimes at the behest of the "Warlocks," a large criminal organization with the means to assist defendant's flight)).) In addition to the other facts distinguishing these cases, Mr. Bloom has never used an alias to evade the government.

proximity with numerous American officials.[4] In Romania, Mr. Bloom's home and business have remained at the same addresses in Bucharest for years, and Romania and the U.S. have a longstanding extradition agreement and Mutual Legal Assistance Treaty in Criminal Matters. Finally, when the government detained and then arrested Mr. Bloom at Newark International Airport, he was traveling under his own name, with his U.S. passport, on a routine trip to visit family and conduct business. In short, had the government sought his capture at any earlier time, they could have brought him into custody with ease.

### D. The Suicide Innuendo

The government suggests—apparently as an alternative to their speculation that Mr. Bloom will flee using his imaginary hidden assets—that he will "injure himself." (Gov't Resp. 3, 16.) The government's suggestion that Mr. Bloom will commit suicide if released has no more basis in fact than the government's other allegations. The government cites no evidence— nor can it—that Mr. Bloom has ever evidenced any suicidal behavior or tendencies. Moreover, at the risk of appearing callous, to grant release, the Court need only find that the defendant is "not likely to flee or pose a danger to the safety of any *other* person or the community." 18 U.S.C. § 3143(a) (emphasis added).[5] In any event, because *no* evidence exists that Mr. Bloom

---

[4] Among others, Mr. Bloom met with Paul Bremer, Colin Powell, and Stuart Bowen in Baghdad. Mr. Bowen, the Special Inspector General for Iraq Reconstruction, appears prominently in the hyperbolic press release the government issued the moment the Court unsealed this case.

[5] Unless the government indeed insists that Mr. Bloom is suicidal and is therefore a danger to another person or to the community, the government appears to concede the "danger" prong of the Court's inquiry, and to contest only whether Mr. Bloom is likely to flee.

8

has ever, has now, or ever will have any desire to kill himself, the government's speculation is irrelevant.

### E. Mr. Bloom's Passports

The government argues that, because it is "unsure how many countries have issued passports" to Mr. Bloom, conditional release would be "precarious." (Gov't Resp. at 14-15.) In support of this argument, the government cites United States v. Minns, 863 F.Supp. 360 (N.D. Tex. 1994). In Minns, the court detained the defendant as a flight risk where the defendant was arrested with seven fake passports under several different fictitious names; was neither a U.S. citizen nor a U.S. resident; had a $32 million civil judgment against him for the shooting of a woman in Texas; had expressed his desire to evade the U.S government; and was an "immigration consultant" having great familiarity with extradition laws. 863 F.Supp. at 363-64. Nothing remotely comparable is present in this case.

Mr. Bloom has never been issued a passport by any country other than the United States. He is a citizen of the United States and nowhere else. When he was arrested, Mr. Bloom was carrying and voluntarily turned over his two legally issued U.S. passports. These passports are currently in the possession of the U.S. Marshals Service, and he has proposed that they remain in the government's possession as a condition of his release.

Recently, the government expressed concern to Mr. Bloom's counsel about a Romanian legal document in Mr. Bloom's name that U.S. Immigration and Customs Enforcement agents believed was a Romanian passport. The document is actually an out-of-date Temporary Residence Permit, a copy of which Mr. Bloom previously turned over to the government pursuant to his cooperation. Copies of the Permit and of a translation performed by Mr. Bloom's

counsel are attached as Exhibit A.  Again, the government's supposition is unfounded and easily dispelled with minimal scrutiny.

### F.  Mr. Bloom's Sophistication

Finally, the government cites five cases in support of the proposition that other courts detain "similarly sophisticated defendants." (Gov't Resp. 15.) In truth, none of those five courts relied on the sophistication of the defendant in ordering detention. The "sophisticated" Harvard-educated physician to which the government refers in United States v. Arndt was a mentally ill methamphetamine addict facing multiple charges of child rape, drug dealing, and drug possession, who previously had lost his physician's license for abandoning an anesthetized patient on the operating table in the middle of spine surgery in order to go to the bank. 329 F.Supp.2d 182, 187-88 (D. Mass. 2004).  In United States v. Cole, a Cold War era case, the defendants apparently worked for the Yugoslavian equivalent of the KGB, faced espionage charges for smuggling special military equipment and Defense Department documents to Yugoslavia, used false names and fake identifications, and, in recorded conversations, expressed an intention to flee the country. 715 F.Supp. 677, 678-80 (E.D. Pa. 1988).  In United States v. Jamal, the court likewise made no mention of the defendant's sophistication but instead found that the defendant was a citizen of Lebanon facing denaturalization and deportation who had stated his intention to "take off to Lebanon," and the court further noted that the U.S did not have an extradition treaty with Lebanon. 326 F.Supp.2d 1006, 1008-09.[6]

---

[6] See also Minns, 863 F.Supp. 360, discussed supra at 9; Levine, 770 F.Supp 460, discussed supra at 4.

10

Mr. Bloom, of course, understands that the law applies equally to sophisticated and unsophisticated defendants. Under the law, the sole issue here is whether the evidence proffered by Mr. Bloom establishes that he is not *likely* to flee under the proposed conditions of release. Mr. Bloom has met and exceeded that burden, and the government's speculative factual allegations and specious legal arguments only serve to emphasize this conclusion.

## III. CONCLUSION

The Government Response makes numerous allegations about Mr. Bloom's ability and intention to flee. Scrutiny of the government's allegations reveals them to be unsupported by fact or law. Mr. Bloom has waited five months to request conditional release from the Court, deferring this matter in order to focus on cooperating fully with the government. Now, Mr. Bloom has established that he is not likely to flee or pose a danger to any other person or the community. This Court therefore should grant Mr. Bloom's Motion to Impose Conditions of Release and release him from custody pending sentencing.

Respectfully submitted,

    /s/  John N. Nassikas III
John N. Nassikas III  (Bar No. 387167)
John Gurley  (Bar No. 396894)
ARENT FOX PLLC
1050 Connecticut Ave., N.W.
Washington, DC 20036-5339
(202) 857-6000 (Telephone)
(202) 857-6395 (Fax)

**OF COUNSEL:**

Timothy P. Kane, Esquire
ARENT FOX PLLC
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339
(202) 857-6000 (Telephone)
(202) 857-6395 (Fax)

Dated:    April 21, 2006