UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    Plaintiff,

     v.

PHILIP H. BLOOM,

    Defendant.

Criminal No.  06–53 (CKK)

**MEMORANDUM OPINION**
(May 6, 2006)

On April 7, 2006, [37] Defendant Philip H. Bloom's Request for a Detention Hearing and Motion to Impose Conditions of Release ("Motion for Release") was filed.  The government filed a [38] Response on April 17, 2006.  Defendant filed a [41] Reply on April 21, 2006.  After considering the aforementioned filings, the plea agreement and factual basis in this case, and the relevant statutes and case law, the Court shall DENY Defendant's Motion and request for a hearing.

**I: BACKGROUND**

Defendant Bloom pleaded guilty on March 10, 2006 to one count of conspiracy in violation of 18 U.S.C. § 371, one count of bribery in violation of 18 U.S.C. § 201, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  In the factual basis for his plea, Defendant stipulated to participating in a scheme whereby various U.S. officials responsible for allocating contracts related to the effort to rebuild Iraq would steer contracts to Defendant and his companies through a rigged bidding process involving false documents and dummy corporations orchestrated by Defendant and Robert J. Stein, Jr., a

Department of Defense contract employee. *See dkt. entry* [28] (Factual Basis). Over $8,641,375

in contracts were steered to Defendant and his companies. *Id.* ¶ 15. Defendant received these

contracts in exchange for providing Stein and other public officials with money, goods, and other

items of value, including the service of laundering currency stolen by Stein and other co-

conspirators from the Coalition Provisional Authority (CPA) in Iraq.[1] *Id.* ¶ 11. Stein and his co-

conspirators stole over $2,000,000 in United States currency, some of which was knowingly

deposited as stolen by Defendant in foreign bank accounts, including accounts under his control

in Iraq, Switzerland, and Romania. *Id.* ¶ 19. Defendant also accepted stolen property, including

body armor and other military equipment, from Stein and others. *Id.* ¶ 18.

Defendant is presently incarcerated in the protective custody unit of the Correctional

Treatment Facility. As he is presently cooperating with the government in its ongoing

investigation related to fraud and public corruption of government officials, a sentencing date has

not yet been set in this case. Based on the charges to which Defendant pleaded guilty, Defendant

faces a statutory maximum of 40 years of imprisonment and $1,000,000 in fines. *See dkt. entry*

[29] (Plea Agreement) ¶ 3. The Parties have determined that under the advisory U.S. Sentencing

Guidelines, Defendant's present net offense level (absent a criminal history calculation or a likely

downward adjustment for acceptance of responsibility) is 34. *Id.* ¶¶ 9, 10. The sentencing

guideline range for an offense level of 34 is 151-188 months imprisonment; assuming a 3-level

reduction for acceptance of responsibility, the sentencing guideline range for an offense level of

---

[1] The CPA was created by the United States and the United Kingdom and Coalition partners "to exercise powers of government temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid, and to eliminate weapons of mass destruction." *See dkt. entry* [28] (Factual Basis) (quoting a letter dated May 8, 2003, from the United States and the United Kingdom to the United Nations).

2

31 is 108-135 months imprisonment.  Defendant is presently sixty-six years old.

## II: LEGAL STANDARD & DISCUSSION

Both sides agree that since Defendant has been convicted but is awaiting sentencing, 18 U.S.C. § 3143(a) governs Defendant's request.  The statute provides that a court shall detain a convicted person pending sentencing "unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)."  18 U.S.C. § 3143(a)(1).  The statute therefore places upon Defendant a high burden to establish by clear and convincing evidence that he poses no danger to the safety of others or the community and that he will not flee if released. While 18 U.S.C. § 3142 governs pretrial release as opposed to release after conviction pending sentencing, the Court may look to factors iterated in 18 U.S.C. § 3142(g) to determine whether a Defendant subject to 18 U.S.C. § 3143 is not likely to flee or pose a danger to the safety of any other person or the community.  *See United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988); *United States v. Majors*, 932 F. Supp. 853, 855 (E.D. Tex. 1996).  These factors include the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

The Court finds that Defendant cannot establish by clear and convincing evidence that he is not likely to flee.[2]  The Court shall analyze the likelihood that Defendant will flee below with

---

[2]  The government, by not addressing the issue in its opposition, concedes that Defendant has demonstrated by clear and convincing evidence that he is not a danger to any other person or the community.  The Court, by its own analysis including the non-violent nature of Plaintiff's crime, does not believe that Defendant poses a danger to

the aid of the factors enumerated in 18 U.S.C. § 3142(g). Before doing so, however, the Court

notes that the three reasons Defendant offers for requesting a modification of his bail terms are

unpersuasive. First, Defendant states that he should be subject to home detention in an apartment

in Washington, D.C., because "his value as a witness is limited" while incarcerated.

"[Defendant] is simply not capable of physically and psychologically coping with the unhealthy,

unsafe, and demoralizing conditions of CTF for an extended period of time while trying

simultaneously to meet the government's understandable demands to debrief, to recall details of

past events, to review documents, and eventually, to testify." Mot. Release at 4. However, the

government does not take issue with the effects of Defendant's incarceration on his cooperation

such that this argument lacks merit. Gov't's Opp'n at 3 ("While creating some logistical and

time constraints, the Defendant's present conditions of incarceration have not prevented the

Government from effectively making use of the Defendant's cooperation.").[3] Second, Defendant

states that if the Court approves his conditional release, Defendant's girlfriend and infant

daughter, who presently live in Bucharest, Romania–where the Defendant himself lived from

1994 up until the time of his arrest–would "reunite" with Defendant in Washington, D.C. Mot.

Release at 2, 3. The Court, however, considers the existence of Defendant's young family, who

permanently reside in Bucharest, Romania, as an element demonstrating Defendant's likelihood

of flight rather than the opposite. While a generally sad state of affairs, Defendant's separation

the safety of any other person or the community, and thus rests its denial of this Motion on the likelihood that
Defendant will flee.

[3] The Court notes that the government "does not oppose a request by the Defendant to be moved to a
different correctional facility pending sentence that would make his conditions of detention less burdensome on the
Government and the Defendant for purposes of his cooperation." Gov't's Opp'n at 4. The Court would be willing to
entertain such a request by the Defendant in a separate filing with the Court.

from his infant daughter as a result of his incarceration is not in any way anomalous in our penal system.  Third, Defendant claims that "[a]s a successful business executive, Mr. Bloom could support himself and his family while on conditional release."  Mot. Release at 10.  However, the Court fails to see how Defendant would be able to do this, since presumably even if the Court had considered imposing conditions of release in lieu of incarceration prior to sentencing (which it will not do), the nature of Defendant's crime would necessitate prohibiting his access entirely to computer, phone, fax, and any communication and/or data transmission or storage devices.

The Court will now explain why Defendant has failed to establish by clear and convincing evidence that he is not likely to flee using the factors iterated in 18 U.S.C. § 3142(g) for guidance.

### A.    Nature and Circumstances of the Offense Charged

The fact of the matter is that Defendant exhibited sophisticated criminal behavior in the execution of a complicated scheme involving dummy corporations and the transfer of millions of dollars worth of assets to multiple bank accounts in multiple foreign countries.  Even in a number of cases related to *pretrial* detention issues in which a *lower* preponderance of the evidence standard is employed in determining whether Defendant is likely to be a flight risk, courts have denied bail based on a criminal's sophisticated criminal conduct, including the ability to move assets and adapt to foreign countries.  *See, e.g., United States v. Townsend*, 897 F.2d 989, 996 (9th Cir. 1990) (holding that bail was rightly denied for non-violent crimes where "[t]he crimes charged required intelligence, planning, capital, facility in deception, international communications, and international motives. . . . All three defendants reside in foreign countries [and] have no significant ties to the United States."); *United States v. Hollender*, 162 F. Supp. 2d

5

261, 266 (S.D. N.Y. 2001) ("[T]he fact that [defendant] is alleged to have been deeply implicated in crimes the nature and circumstances of which involve deception; that those deceptions are alleged to have included the use of false and fictitious identities, both individual and corporate; and that sophisticated supporting documentation manufactured to assist in the use of those identities appears [sic] was seized . . . strongly support a finding that there was no condition or set of conditions that would reasonably assure defendant's appearance.").

Furthermore, the lengthy sentence likely faced by Defendant–coupled with his present age–suggest that a large percentage of Defendant's remaining years (based on expected lifespan) will be spent incarcerated, providing additional motivation for Defendant to flee.  While Defendant claims that "he understands that the only way to lessen his sentence is by cooperating fully with the government [and] knows that any attempt at flight would greatly increase his sentence and eliminate the realistic prospect, given his immediate and continuing substantial assistance to the government, of a significant reduction in his sentence," Mot. Release at 9, the fact is that even if Defendant's sentence were reduced on this basis, Defendant could still face incarceration for a substantial period of his remaining years.

> B.      *Weight of the Evidence Against Defendant*

As Defendant pleaded guilty in the instant case, the factual basis sets out the extensive and uncontroverted weight of the evidence against the Defendant.  *See dkt. entry* [28].

> C.      *History and Characteristics of the Defendant*

Factors to be considered in evaluating the history and characteristics of a defendant include:

(A) the person's character, physical and mental condition, family ties, employment,

6

financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

18 U.S.C. § 3142(g)(3).

Defendant notes that he lived in Bucharest, Romania, for the eleven years prior to his arrest, where he owns a home, has a girlfriend and infant daughter, is active in the community, and does not partake in alcohol or drugs. Mot. Release at 2–3, 10. While these details would help to persuade the Court that Defendant is not a danger to the community (which is not at issue in this case), they are also in fact reasons why the Court is concerned about Defendant's likelihood of flight. Namely, Defendant's ties are to individuals (and to his own existence) in Romania, not the United States. Notably, Defendant has no ties to the instant jurisdiction–none of his family members live in the District of Columbia, nor does he presently have any sort of residence here.

Morever, even if the more expansive view of "community" adopted by the Ninth Circuit were taken, defining a defendant's community as the United States in its entirety,[4] Defendant still cannot show substantial ties to the "community" that is the United States. While Defendant has an adult son who lives in New Jersey and siblings who live in Pennyslvania, and Defendant defines his relationship with these individuals as "close," Mot. Release at 2, the fact is that Defendant has chosen to live half way across the world from these individuals for the last eleven

---

[4] *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).

years of his life.  While the Court notes that these individuals have agreed to post certain of their

assets to ensure that he follows any conditions of release, their confidence in Defendant's ability

to appear before this Court is outweighed by Defendant's incentives to return to a life displaced

from the country in which these individuals live.

Finally, the Court notes that Defendant exhibits a history of deceptive criminal behavior,

as Defendant pleaded guilty in 1991 in the Superior Court of New Jersey to three counts of Theft

by Deception, nine counts of Issuing a Bad Check and one count of Issuing a Bad Sight Order.

Mot. Release at 10; Gov't's Opp'n at 11.  While Defendant successfully completed an intensive

supervision program related to these charges, the Court notes that Defendant in that instance had

every incentive to comply with the terms of such a program, as he had been resentenced to

intensive supervision after serving four months in prison in lieu of the five years imprisonment to

which he was originally sentenced.  Gov't's Opp'n at 11.

Defendant offers a number of cases in support of his position that he should be

conditionally released.  However, in analyzing the cases relied upon by Defendant, the Court

finds that they are inapplicable to the case at hand because of important distinctions with respect

to the history and characteristics of the defendant involved and/or with respect to the potential

sentence faced by the defendant.  *See Troung Dinh Hung v. United States*, 439 U.S. 1326 (1978)

(defendant had resided in the United States for approximately thirteen years, and a significant

constitutional question was on appeal in this bail determination made pursuant to 18 U.S.C. §

3143(b)); *United States v. Quinn*, 416 F. Supp. 2d 133 (D.D.C. 2006) (defendant faced only a 39-

month sentence, and a close legal question was on appeal in this case pursuant to § 3143(b));

*United States v. Salvagno*, 314 F. Supp. 2d 115 (N.D. N.Y. 2004) (one defendant was likely to

8

serve as a kidney donor for his son while the other defendant was suffering from prostate cancer and caring for his wife during her continued battle with cancer); *United States v. Majors*, 932 F. Supp. 853 (E.D. Tex. 1996) (34-year old defendant had lived in Texas since he was eight years old and faced a likely sentence of between 21 months and five years); *and United States v. Mahabir*, 858 F. Supp. 504 (D. Md. 1994) (defendant had resided in this country for the preceding 24 years, though bail was denied in this case anyway on alternate grounds).[5]

> D.    *Nature and Seriousness of Danger Posed by Defendant*

As stated above, the government concedes (and the Court agrees) that Defendant does not appear to pose a danger to others or the community.

Analyzing the arguments presented by Defendant using this framework, the Court has determined that Defendant has not met his burden as set forth in 18 U.S.C. § 3143(a) to provide clear and convincing evidence that he is not likely to flee.  In making this determination, the Court relies in large part on the dishonest and sophisticated nature of the crimes for which Defendant has been convicted, the substantial sentence that he will likely face, his complete lack of ties to the District of Columbia, his residence in Romania for the eleven years prior to his arrest, and his considerable ties to Romania.

> E.    *Defendant's Request for a Detention Hearing*

Considering that Defendant's Motion to Impose Conditions of Release was fully briefed to the satisfaction of the Court, and relying on the facts as iterated in the Factual Basis of the Plea Agreement in this case, the Court deems a Detention Hearing unnecessary with respect to

---

[5]  In the other case cited by Defendant, *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004), the Court held that release on bond prior to trial was proper, which is governed by a significantly more lenient standard since no adjudication of guilt has yet been made.  *See* 18 U.S.C. § 3142(e).

Defendant, who has already been convicted and is awaiting sentencing.

### III:  CONCLUSION

For the aforementioned reasons, the Court shall DENY [37] Defendant Philip H. Bloom's

Request for a Detention Hearing and Motion to Impose Conditions of Release.  An Order

accompanies this Memorandum Opinion.


Date:   May 6, 2006

                                               _/s/_____
                                               COLLEEN KOLLAR-KOTELLY
                                               United States District Judge

10